LAMB ENTERPRISES, INC., a Delaware Corporation, Wonderland Ventures, Inc., a Michigan Corporation, Plaintiffs-Appellants,

v.

The **TOLEDO BLADE COMPANY** et al., Defendants-Appellees.

No. 71–1662.

United States Court of Appeals, Sixth Circuit.

May 31, 1972.

Gerald H. Gottlieb, Los Angeles, Cal., for appellants; Gerad H. Gottlieb, Los Angeles, Cal., Marvin L. Karp, Cleveland, Ohio, on brief.

Robert J. Hoerner, John Lansdale, Jr., Cleveland, Ohio, for appellees; John Lansdale, Jr., James H. Woodring, Squire, Sanders & Dempsey, Cleveland, Ohio, for the Toledo Blade Co., Daniel

M. Redmond, Dow, Lohnes & Albertson, Washington, D. C., for Cox Broadcasting Corp., Ralph Bragg, Spengler, Nathanson, Heyman, McCarthy & Durfee, Toledo, Ohio, for Buckeye Cablevision, Inc., Thomas P. Mulligan, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for the Ohio Bell Tel. Co., on briefs.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and WILSON *, District Judge.

WEICK, Circuit Judge.

This appeal arises out of a private anti-trust action brought by the Lamb companies (Lamb) in the District Court against The Toledo Blade Company (Blade), Cox Broadcasting Corporation (Cox), Buckeye Cablevision, Inc. (Buckeye), and Ohio Bell Telephone Company (Bell), to recover $54,319,900 damages, the complaint alleging that Lamb was excluded from the community antenna television (CATV) business in Toledo, Ohio, as a proximate result of a conspiracy entered into by said defendants to violate Sections 1 and 2 of the Sherman Act[1] and Section 7 of the Clayton Act[2]. The complaint contained a separate count against Bell alone, in which Lamb sought to recover damages for breach of an alleged contract to provide Lamb priority in service and equipment of a CATV station in Toledo, and contained also a count for damages against Cox, Blade and Buckeye for allegedly inducing Bell to breach its contract with Lamb.

The case was tried before a jury for five weeks, during which time Lamb abandoned its claims against Bell for breach of contract and against Cox, Blade and Buckeye for inducing such breach. At the close of the evidence and arguments of counsel the Court submitted to the jury, as authorized by Rule 49(a) Fed.R.Civ.P., a special verdict re-quiring the jury to make a special written finding upon each issue of fact.

The jury made findings as follows:

Special Issue No. 1:

Do you find from a preponderance of the evidence that during the period between January 26, 1965 and March 23, 1966, the defendants Blade, Buckeye, Cox, and Bell, or any combination with each other, entered into a combination, contract or conspiracy, the purpose of which was to foreclose, prevent, or preclude plaintiffs Lamb from entering the community antenna television business in the Greater Toledo area?

The answer is, "No."

Special Issue No. 4:

Do you find from a preponderance of the evidence that from approximately January 26, 1965, to approximately the latter part of September, 1965, the defendants, or any of them individually, were engaged in a "relevant line of commerce", product or service market, as these terms have been defined to you, in the Greater Toledo area?

The answer is, "Yes."

Special Issue No. 5:

Do you find from a preponderance of the evidence that during the period from January 26, 1965, to approximately the latter part of September, 1965, the defendants, or any of them, individually or in any combination with each other, possessed monopoly power so as to control and dominate interstate trade and commerce in the mass communications media, or in dissemination of news and advertising, to such an extent as to exclude actual and potential competitors from that field of interstate trade or commerce?

The answer is, "No."

Special Issue No. 8:

Do you find from a preponderance of the evidence that any such monop-

---

* The Honorable Frank W. Wilson, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

1. 15 U.S.C. § 1 & 2.

2. 15 U.S.C. § 18.

oly or attempt to monopolize, as above found by you, was a substantial and proximate cause of damage to the business or property of plaintiffs Lamb?

The answer is, "No."

Special Issue No. 10:

Do you find from a preponderance of the evidence that from approximately January 26, 1965, to approximately the latter part of September, 1965, Blade and Cox were engaged in a "relevant line of commerce", produce or service market, as those terms have been explained to you? If so, identify such "relevant line of commerce."

The answer is, "Yes; dissemination of news."

Special Issue No. 11:

Do you find from a preponderance of the evidence that the effect of organizing Buckeye and the acquisition of its stock and assets by Blade and Cox in February, 1965, was either to substantially lessen competition or tend to create a monopoly in the "relevant line of commerce" you found in answer to Special Issue No. 10 in a "relevant geographic market" as that term has been explained to you in the Court's charge?

The answer is, "No."

The Court then entered judgment, dismissing the complaint. Lamb appealed, confining its claims of error to alleged violations of Section 1 of the Sherman Act and the Court's instructions to the jury. It is the claim of Lamb that there was a per se violation of Section 1 and that the judgment should be reversed "and the case remanded to the District Court for a new trial as to the amount of injury and damage suffered by plaintiffs as a result of defendants' violations of Section 1 of the Sherman Act," and in the alternative, for a new trial. We affirm.

## I

A CATV system is a facility which receives television signals over high antennas erected on a tower, the base of which houses equipment which amplifies or modifies the signals transmitting programs broadcast by one or more television stations, and distributes such signals by coaxial cable to homes of subscribers who are willing to pay for such service.

A cable television company, desirous of entering into the business, may erect its own distribution system by renting from utility companies space on their utility poles for its equipment. Such an arrangement is known as "pole contact." Or the CATV company may contract with a telephone company whereby the telephone company agrees to construct the distribution system and lease it back to the CATV company under tariffs filed with the state Public Utilities Commission. Such an arrangement is known as "lease-back."

The corporate plaintiffs are entirely owned and controlled by Edward Lamb, of Toledo, and his family. Lamb was the majority stockholder and in complete charge of all operations. Lamb has been engaged in the operation of radio and television stations for a number of years, but more recently of CATV systems.

Blade, an Ohio corporation, owns and publishes two daily newspapers in the greater Toledo area, namely, The Blade, and The Toledo Times.[3]

Cox and its subsidiaries have interests in CATV systems in fourteen states.[4]

Buckeye is an Ohio corporation organized by Blade and Cox to furnish CATV service in the greater Toledo area. Its shares of stock were owned initially 55% by Blade and 45% by Cox, and are owned now 80% by Blade and 20% by Cox.[5]

Bell is a public utility which became interested in providing CATV service in

3. Stip. 44A.
4. *Id.*

5. *Id.*

1964. The service was provided under tariffs filed with the Public Utilities Commission of Ohio.

## II

The controversy in this case arises out of efforts of two corporations, Buckeye and Lamb, competing to be first to obtain a natural monopoly in the CATV business in Toledo. To be first to obtain the completed facility was all-important because in the CATV business, like that of electric, gas and telephone utilities, it is not feasible to compete house-to-house for customers in the same area. Buckeye was able to and did arrange construction of its CATV facilities first, and Lamb claims that this violated the anti-trust laws. We disagree.

Cox was first to approach Bell about CATV service in the Toledo area. The meeting took place in Atlanta, Georgia, on January 22, 1965. A few days later Cox met with officials of Blade and they agreed to organize Buckeye as an Ohio corporation in order to enter into the cable television business in Toledo. Bell was informed of the agreement, and it was made known to the public by a news item in the Toledo Blade on February 3, 1965, which was the date of incorporation of Buckeye.

Bell wrote Cox under date of February 2, 1965, offering to furnish cable television for the cities of Cleveland, Toledo, Columbus and Dayton, and setting forth rates for a five-mile and for an eleven-mile distribution system. Following this, there was additional correspondence and meetings between Buckeye and Bell resulting in an agreement whereby Bell agreed to and did furnish "lease-back" service to Buckeye for an eleven-mile distribution system in the Toledo area, at a cost in excess of $1,000,000.

Lamb's initial contact with Bell was on January 26, 1965. They discussed policies on pole contact and lease-back arrangements. Lamb indicated an interest in CATV installations, not in Toledo but in several cities in the Findlay, Ohio District. On January 29, 1965,

Lamb wrote Bell stating that he would like to examine CATV possibilities in Sandusky, Fremont, Upper Sandusky and Norwalk. Bell then sent to Lamb a proposal containing the charges for a five-mile and for an eleven-mile distribution system for Sandusky, Fremont and Upper Sandusky; Norwalk was not included because Bell does not serve that city.

Bell's proposal was made subject to applicable tariffs approved by the Public Utilities Commission of Ohio. On February 9, Lamb requested proposal letters for Canton and Massillon, and on February 10 Lamb sent Bell a letter of intent for all five cities. On February 12 Lamb advised Bell that it decided to compete with Toledo Blade for cable television in Toledo. Bell immediately sent a proposal letter to Lamb in which it furnished rates for a five-mile and for an eleven-mile distribution system for Toledo. Three days later Lamb notified Bell that it had decided *not* to wire Toledo for CATV at this time.

On March 3, 1965, Buckeye requested Toledo City Council to enact an ordinance granting it a permit to do business in Toledo, notice of which request was published in the Toledo newspapers. Several days later Lamb changed his mind and filed with Toledo City Council a request for a franchise and notified Bell that he was interested in a proposal for cable television for Toledo.

Bell then sent Lamb another proposal similar to the one submitted on February 15, quoting the same rates for a five-mile and for an eleven-mile distribution system. On April 12 Lamb signed a letter of intent to Bell for an eleven-mile distribution system without stating what area in the city was to be embraced. Lamb met with Bell on June 17, 1965, and designated a small section near the center of Toledo on the west side of the Maumee River. Lamb indicated that this was all that he was interested in at the present time.

The parties met again on June 29, and Lamb again changed his designated section from the west side to the east side of the Maumee River, and also selected a

small five-mile system to serve a thirty-mile wide area, rather than an eleven-mile system. Bell advised Lamb that the five-mile system would not reach the west side of the Maumee River, but Lamb stated that if he desired to serve that side he would build another system. It was not disputed that the operation of such a small area was not economically feasible.

However, Bell computed the estimated charges for the five-mile system, and Lamb accepted by letter dated July 17, 1965, enclosing a check for $44,975.00 for the cost. As to any additional segments, the letter stated:

"At such time, the undersigned or his nominee may at its option: (1) make similar individual advance payments for such segments; (2) request you to delay in proceeding with further work on its behalf with respect to such segments until a subsequent time of its designation; (3) cancel the order with respect to any such individual segment; (4) cancel the order with respect to subsequent segments, or (5) assign any such segment to another nominee." (340A)

These reservations were not apt to convince anyone that Lamb in good faith intended to build other segments.

Bell performed the engineering for Lamb for the five-mile segment and arranged to meet Lamb on November 10, 1965 for approval of the engineering plans prepared by Bell, which approval was necessary before construction could proceed. Lamb did not show up for the meeting. He testified that he had decided on September 15, 1965 not to proceed, but he never notified Bell, and Bell proceeded to complete the engineering work. The reasons which Lamb gave for not going ahead was that Bell had breached its agreement to build first for Lamb and also to keep it secret. As before stated, Lamb did not prove that there was any such agreement.

### III

Legislative events affected the actions of the parties, events consisting of ordinances passed by City Councils of not only Toledo, but other cities in Ohio as well, where Bell was constructing CATV systems for Lamb (Fremont, Sandusky and Akron), which ordinances required permits and franchises in order to enter into the CATV business.

Tariffs filed by Bell with, and approved by, the Public Utilities Commission of Ohio, provided:

"The customer shall comply with applicable laws and ordinances and shall obtain any franchises and permits required by law or ordinances."

On March 3, 1965, Buckeye requested the City of Toledo to pass an ordinance granting it a permit to engage in the CATV business in that city. There was some question whether this was necessary under a "lease-back" arrangement. On March 15 Lamb filed with the city a proposed cable television permit ordinance similar to the one filed by Buckeye but containing provision for a slightly higher percentage of gross revenue to the city. A number of meetings were held by the City Council to consider the proposed ordinances, during which Lamb requested a delay in granting any franchise.

On May 17, 1965, the City Council passed a general regulatory ordinance for cable television and another ordinance granting Buckeye a permit to enter the cable television business. The permit was non-exclusive. Lamb also applied for such a permit; his application was not acted upon and no permit was ever issued to him.

On November 29, 1965 the City Council passed Ordinance 942 which prohibited cable television companies from going into business without first securing from the City a permit. Lamb never applied for such a permit under this ordinance.

The ordinance was declared unconstitutional by this Court more than five years later. Lamb Enterprises, Inc. v. Toledo, 437 F.2d 59 (6th Cir. 1971).

While Lamb and the defendants other than Bell engaged in so-called lobbying

activities before the Toledo City Council, Bell took no part therein and adopted a wholly neutral attitude. Although Bell was requested by Lamb to join with him to fight the Toledo ordinances, Bell declined to do so.

■ All of the parties were bound by the provisions of the tariff approved by the Public Utilities Commission. Bell had the right to assume that the Toledo ordinances were constitutional until they were declared unconstitutional.

■ Nor could the subsequent adjudication of unconstitutionality of the ordinance impose a liability upon Bell, since it complied with the tariff, as it was obligated to do. *Cf.* Washington Gas Light Co. v. Virginia Elec. & Power Co., 438 F.2d 248 (4th Cir. 1971); E. W. Wiggins Airways, Inc. v. Massachusetts Port Auth., 362 F.2d 52 (1st Cir.), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966).

■ A public utility may not be held for an anti-trust violation when it has complied with its tariff. Georgia v. Pennsylvania R. R. Co., 324 U.S. 439, 453, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). And this is true even though the tariff subsequently was determined invalid. McClellan v. Montana-Dakota Utilities Co., 104 F.Supp. 46 (D.Minn.1952), aff'd 204 F.2d 166 (8th Cir.), cert. denied, 346 U.S. 825, 74 S.Ct. 43, 98 L.Ed. 350 (1953).

Construction of the segment selected by Lamb could never have been completed before passage of the November 29th ordinance, since Lamb had not even approved the engineering plans for the construction. He had also secretly abandoned the project in September.

### IV

Lamb complains about Bell's policy decision relative to priorities. Bell had advised Buckeye by letter on July 16, 1965, that it had received from another customer (Lamb) an order for a thirty-mile stretch; that it proposed to build for both customers, simultaneously; and that it expected to finish both seg-

ments at about the same time. Bell stated, however, that if shortages of labor or material should develop, it would give construction priority to the customer in the thirty-mile system (Lamb), and to Buckeye in the balance of the areas which it had previously specifically designated.

Buckeye, on July 7, 1965, had divided the map into ten segments, and on July 8 it had accepted Bell's proposal and paid $110,188, which was ten per cent of the estimated cost.

Thus, in the event of shortages Lamb was to be given priority in the construction of everything he had ordered. He can hardly complain about that. However, although Bell anticipated that shortages in labor and material might develop at the time orders were placed by Buckeye and Lamb, such shortages never did occur.

### V

Lamb contends that the undisputed evidence establishes that the defendants, Blade, Cox and Buckeye, intended to secure an exclusive position in Toledo CATV, and that such a joint intent by itself violates section 1 of the Sherman Act. Lamb intended to do the same thing. Further, he argues that Bell's agreement to construct for Buckeye the segments selected by it made Bell a party to a combination and a conspiracy to restrain trade. We disagree.

■■ Here it is clear that Lamb and the defendants were competing in a natural monopoly situation in which two or more CATV operators could not survive in direct house-to-house competition. The jury's special findings established that there was no violation of the anti-trust laws. We find substantial evidence in support of the jury's finding that there was not a conspiracy the purpose of which was to prevent Lamb from entering the CATV business in Toledo. Moreover, to hold, as Lamb urges, that there was a per se violation of the Sherman Act here would place major obstacles in the way of entrepreneurs in situations

where only one competitor could survive. Here, for example, both parties were competing to become the first in business in the greater Toledo area. If success in such a venture could become a per se violation of the anti-trust laws, the ultimate effect would be to stifle, rather than to encourage, competition and formation of new business enterprises. In this instance, however, there seems to have been healthy competition between Lamb and Buckeye to establish the first CATV system in the greater Toledo area.

While the evidence showed that defendants, Cox, Blade, and Buckeye, were prompt, direct and decisive in their dealings with Bell, Lamb was indecisive and he vacillated. First, Lamb was interested in wiring smaller towns in the Findlay, Ohio area, and then in Sandusky, Fremont, Upper Sandusky and Norwalk. As to these cities he proceeded promptly with Bell.

When Lamb learned of Buckeye's interest in Toledo, he also became interested, and he secured proposals from Bell; then he changed his mind and advised Bell that he had decided not to wire Toledo. He changed his mind again when he learned of Buckeye's application to Toledo's City Council for a permit, and he applied again to Bell for proposals, which were again promptly given to him.

On April 12, Lamb signed a letter of intent to Bell for an eleven-mile system, without stating what area in the city it was intended to cover. It was not until June 17 that he met with Bell and selected an area near the center of Toledo, on the west side of the Maumee River. He indicated that that was all he was interested in at the present time. Lamb and Bell met on June 29 and Lamb again changed his mind. He selected a new section on the east side of the Maumee River, instead of the one on the west side which he had previously selected. He also selected a smaller five-mile system to serve a thirty-mile area, rather than the larger eleven-mile system which he had selected on the west side of the

river. He did this although he knew that operations in such a small area were not economically feasible, and he conditioned his acceptance so that he was under no obligation whatsover to proceed further. Had he selected an eleven-mile system, he would have been required to make a deposit of more than twice the sum which he paid. Buckeye had made a deposit of $110,188, and designated ten segments on the map which it desired to wire.

It is clear to us that Lamb, by his own conduct and dealings with Bell, excluded himself from the business in Toledo, instead of being prevented, as he alleged, by anti-trust violations, from entering the business there.

■ Insofar as Bell is concerned, the anti-trust laws do not require it to show preference to one who is indecisive.

Bell was always ready to, and did, proceed with the engineering of the small segment selected by Lamb. It did not proceed with construction because Lamb abandoned the project without even approving the engineering drawings. There was not a scintilla of evidence connecting Bell with any conspiracy. So far as Bell was concerned, it was willing and able to construct duplicate facilities for Buckeye and Lamb, simultaneously.

■ It is a per se violation of the anti-trust laws to enter into a price-fixing arrangement, International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947), or to engage in a group boycott, Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), or to eliminate, by joint collaborative action, discounters from access to the market, United States v. General Motors Corp., 384 U.S. 127, 145, 86 S.Ct. 1321, 16 L.Ed. 2d 415 (1966). However, the Supreme Court has never held that one who succeeds in a natural monopoly situation, in the face of competition, has committed a per se violation of the anti-trust laws.

This kind of situation was discussed by the First Circuit in Union Leader Corp. v. Newspapers of New England,

Inc., 284 F.2d 582 (1st Cir. 1960). Although the discussion in *Union Leader* is addressed specifically to section 2 of the Sherman Act, nevertheless we feel it is apposite in the present case, in a similar natural monopoly situation.

> "It was a foregone conclusion that if successful the Journal would eventually drive the Gazette out of business, and, naturally, Union Leader proposed to succeed. But intending the natural consequences of acts which are in all respects lawful, does not constitute the 'exclusionary intent' that is a prerequisite for finding a violation of section 2. In other words, a natural monopoly market does not of itself impose restrictions on one who actively, but fairly, competes for it, any more than it does on one who passively acquires it. In either event, there must be some affirmative showing of conduct from which a wrongful intent can be inferred." (*Id.* at 584)

In a footnote to the above quote, the Court noted:

> "An interesting speculation might be whether the anti-trust laws were intended to protect one natural monopolist against another, in view of the fact that there was no competition before the battle began and there would be none afterwards." (*Id.* at 584 fn 4)

We need only decide, and we do, that the circumstances of this case do not give rise to a per se violation of the antitrust laws. Here the jury found specially that the defendants did not enter into any conspiracy the purpose of which was to preclude Lamb from entering the CATV business in the greater Toledo area.

■ In a natural monopoly situation any successful competitor gets the market. Thus, it cannot be "unreasonable, per se, to foreclose competitors from any substantial market," United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948), where such foreclosure is the natural result of success in a natural monopoly situation.

■ The agreement between Blade and Cox to form Buckeye, and the subsequent arrangement with Bell, were made to further the business interests of each. The dominant motive of each was undoubtedly to succeed in the CATV business in Toledo, and not to prevent Lamb from entering the business. The resulting effect on Lamb was not a per se violation of section 1.

In Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), the Court said:

> "Not every agreement is *per se* 'in restraint of trade' within the meaning of section 1. See White Motor Co. v. United States, 1963, 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738. Thus, it is well settled that it is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means cutting off another distributor. [Citing authority]." (*Id.* at 76).

The Court further said:

> "The proper line to be drawn, we think, is that stated by Barber in 'Refusals to Deal Under the Federal Antitrust Laws,' 103 U. of Pa.L.Rev. 847 (1955), at 876–77:
>
> \* \* \* \* \* \*
>
> ". . . The issue in these cases is not the existence or nonexistence of concerted refusal to deal, but rather whether the purpose and effect of the operation of the contract, association, exchange or joint sales agency was such as unreasonably to exclude outsiders from participation in the trade in question. The principle of the group boycott cases—that it is prima facie unreasonable for a dominant group to combine to coerce—is not here applicable.' " (*Id.* at 77–78).

### VI

Lamb contends that the Court below erred in refusing to admit into evidence plaintiff's exhibit 43, which is a copy of a letter sent by Cox's attorney to attorneys for Buckeye and to the vice-

president of Cox, and which reads as follows:

> Here are reprints from yesterday's issue of Broadcasting Magazine relating to an FCC staff letter to State Attorney Generals alleging FCC concern about telephone companies bypassing local franchising authorities. This supplements our report last week regarding actions by the California Attorney General and the Jackson, Michigan City Council.
>
> This is background information in the event circumstances ultimately required or justified an effort to forestall a competitor through action of the Toledo City Council—or possibly in connection with any continuing debate with Ohio Bell regarding priorities.

Lamb argues that this exhibit does not come within the rule that immunizes lobbying activities from the anti-trust laws, Eastern Railroad Presidents v. Noerr, Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Moreover, Lamb asserts, the sole purpose of offering the exhibit was to demonstrate the purpose and character of defendants' acts, a permissible use even if the letter was within the *Noerr* exception. UMWA v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

■ We agree with the defendants that this letter does fall within the *Noerr* exception, for the right to petition the Government would be seriously jeopardized if persons could not consult and decide how best to petition governmental units for redress, or legislation. Nevertheless, this does not end the matter, for, as the Court said in UMWA v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965):

> "It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason

are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny. [Citing authorities].'" (*Id.* at 670–671 fn 3, 85 S.Ct. at 1593).

■ Thus, the trial judge must be given discretion in determining the effect that certain evidence would have on the trial, in deciding whether it should be admitted to show the "purpose and character" of the defendants' acts.

And, as stated by the Court in United States v. Johns-Manville Corp., 259 F. Supp. 440, 453 (E.D.Pa.1966):

> "In any event, by the terms of that footnote, it is within the province of the trial judge to exclude such evidence if he finds that it is not probative or is unduly prejudicial."

In the present case the trial judge made the exact finding:

> "Well, my ruling is at this point in time that I am going to sustain the objection, because I think at this point in time it would be highly prejudicial." (68A)

■ Such a ruling by the Court cannot be said to constitute an abuse of discretion, for the Judge was in the best position to determine the effect that admission of the document would have on the course of the trial at the time it was offered.

### VII

Plaintiffs contend that the trial court erred in instructing the jury that it must determine whether "an unreasonable restraint" existed, and that "a conspiracy . . . can exist only if there was . . . concert of action between them [the defendants] in unreasonable restraint of trade . . . ." This was error, the plaintiff says, because the exclusion of Lamb from the market was unreasonable as a matter of law.

■ This instruction was not error. In Section I of this opinion we rejected the argument that there was

any per se violation of the anti-trust laws here. Otherwise, section 1 of the Sherman Act applies only to unreasonable restraints of trade. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910); Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418 (1957). Thus, the trial court's instructions were proper.

### VIII

In another allegation of error closely related to its per se argument, Lamb claims that the trial court erred in instructing the jury:

"In determining the existence of an unreasonable restraint, you need not find a specific public injury, but you must find that the defendant's conduct was reasonably calculated to prejudice the public interest."

Lamb states:

"The law is clear that there is no requirement of injury to the 'public interest' in order to establish a cause of action under section 1," citing Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 210–11 [79 S.Ct. 705, 3 L.Ed.2d 741] (1959); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656 [81 S.Ct. 365, 5 L.Ed. 2d 358] (1961); Continental Ore Co. v. Union Carbide Corp., 370 U.S. 690, 708 [82 S.Ct. 1404, 8 L.Ed.2d 777] (1962).

Each of these cases involved a per se violation of section 1 of the Sherman Act. *Klor's* and *Radiant Burners* each involved group boycotts, while *Continental Ore* involved a refusal to deal, price fixing, and customer allocations.

 In the present case, however, there has not been a per se violation of the Sherman Act. Thus the trial court's instructions were proper, because even the cases cited by Lamb establish that where there is no per se violation it must be determined whether or not the activity in question unreasonably restrains trade. If the activity is not unreasonable, the Act is not violated.

Cherokee Labs., Inc. v. Rotary Drilling Serv., Inc., 383 F.2d 97 (5th Cir. 1967).

 If there had been a per se violation here, then the charge would have been error. In Continental Ore Co. v. Union Carbide Corp., *supra* (370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)) the Court said:

"An error committed by the trial court, perhaps understandable because the trial preceded this Court's decision in Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, [79 S.Ct. 705, 3 L.Ed.2d 741], was the 'public injury' charge. Although petitioners pleaded a concerted refusal to deal with them by respondents, a price-fixing conspiracy, and an allocation of customers, all *per se* violations under § 1 of the Sherman Act, the court charged the jury that a conspiracy must be proved 'which was reasonably calculated to prejudice the public interest by unduly' restraining trade, and which was intended 'to injure the general public by' restraining trade. Under the rule stated in *Klor's*, this charge was error." (*Id.* at 708, 82 S.Ct. at 1415).

But where there is no per se violation of the anti-trust laws the jury must determine whether the conduct in question unreasonably restrains trade. Thus the Fifth Circuit has said in Rogers v. Douglas Tobacco Board of Trade, Inc., 266 F.2d 636 (5th Cir. 1959):

"In the Sherman Act Congress has determined that certain prohibited activities are injurious to the public. Radovich v. National Football League, 1957, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed.2d 456. As to classes of restraints which from their 'nature or character' are unduly restrictive, Congress has determined its own criteria of public harm. Klor's, Inc. v. Broadway-Hale Stores, Inc., [359 U.S. 207] 79 S.Ct. 705, 709 [3 L.Ed.2d 741]. In restraints, like the present one to which 'the rule of reason' applies, while the jury should not, and cannot properly, reject the policy of the

Sherman Act which has been determined by Congress, it must still decide whether the particular conduct is reasonably calculated to prejudice the public interest which that Act is designed to protect.

. . . That does not mean that specific public injury must be proved before a private person can recover; but before it can be said that the conduct is forbidden as *unreasonably* restraining trade or commerce within the meaning of the Sherman Anti-Trust Act it must appear that it *tends* or is *reasonably calculated* to prejudice the public interest." (*Id*. at 644).

See also Cherokee Labs, Inc. v. Rotary Drilling Serv., Inc., *supra*.

For the foregoing reasons, the trial court's instruction requiring a finding that the defendants' conduct was "reasonably calculated to prejudice the public interest" was proper.

### IX

 The trial court instructed the jury in conventional conspiracy terms:

"A conspiracy is a combination of *two or more persons, by concerted ac*tion to accomplish some *unlawful purpose,* or to accomplish some lawful purpose by unlawful means, in this case to violate the United States Antitrust laws as charged." (157A)

Plaintiffs claim that this instruction was misleading and prejudicial, basing their contention on language in American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), which states:

"It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." (*Id*. at 809, 66 S.Ct. at 1139).

Plaintiff asserts that its requested instruction Number 4, which was based on this language, should have been given. But the trial court's definition of conspiracy was correct. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349 (1921); Apex Hosiery Co. v. Leader, 310 U.S. 469, 516, 60 S.Ct. 982, 84 L.Ed. 1311, Hughes, C. J., dissenting, (1940).

The *American Tobacco* dicta indicates that, assuming the existence of a conspiracy to restrain trade, the unlawful objective could be accomplished by wholly innocent acts. Here, however, the District Court could not assume the existence of a conspiracy with an unlawful objective, for this was a question for the jury. In any event, the trial court's instructions are consistent with *American Tobacco,* for they certainly allowed the jury to find whether there was a combination to accomplish an unlawful purpose, by either lawful or unlawful means. The only difference is that the language in *American Tobacco* perhaps makes this more clear.

But Lamb's requested instruction Number 4 implies that an unlawful objective is present, and is in that way more prejudicial to him than the instruction given by the trial court. Thus, there was no error in the instructions given by the trial court on this point.

### X

Lamb contends that to prove restraint of trade it is unnecessary to prove that the defendants intended to restrain trade; rather it argues, all that must be proven is that a restraint resulted from the defendants' conduct. United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Thus, he argues that the District Court erred in submitting to the jury a special verdict which required a finding of wrongful intent before it could conclude that there had been an unlawful restraint of trade, and that instead, the trial court should have given plaintiff's requested charge Number 1, which reads in part as follows:

"Under the antitrust laws of the United States, an illegal combination or conspiracy to restrain trade occurs if two or more of the defendants engage in joint activity which has the result of limiting or excluding competition in a given market.

"If, therefore, you find from a preponderance of the evidence that two or more of the defendants herein combined or conspired together to exclude competition in CATV in Toledo, or that they engaged in joint activity which had the result of limiting or excluding competition in CATV in Toledo, then you must find that those defendants violated Section 1 of the Sherman Act." (134A)

However, this requested charge is incorrect, for it would permit the jury to find a violation of section 1 of the Act by joint activity or conspiracy to accomplish a lawful purpose by lawful means. There is no such violation of section 1 of the Act.

Moreover, the trial court's instructions were proper. United States v. Griffith, *supra,* held that when a monopolist exercises its power to exclude competitors, it is not necessary to find a specific intent to monopolize, but rather, that the defendant would be liable for the natural and probable consequences of his acts; he is "chargeable in legal contemplation with that purpose since the end result is the necessary and direct consequence of what he did." (334 U.S. at 108, 68 S.Ct. at 946).

The trial court instructed the jury:

"Ordinarily, it is reasonable to infer that a person intends the natural and probable consequences of acts knowingly done, or knowingly omitted. So, . . . you may draw the inference and find that any person involved intended such natural and probable consequences as one standing in like circumstances . . . ." (162A)

Consequently, the Special Issue No. 1 did not require a finding of specific intent, but permitted the jury to find a violation of the Act if the defendants conspired to commit acts the direct consequences of which was a violation of the Act. Therefore, nothing in the trial court's charge or in Special Issue No. 1 was inconsistent with the holding in United States v. Griffith, *supra.*

## XI

Finally, Lamb assigns as error the trial court's instructions with respect to section 2 of the Sherman Act. The Court charged, *inter alia,* that to prevail under section 2, plaintiffs must prove:

"1. That defendants, or any of them, knowingly conspired or combined either to obtain, or to maintain, the power either to remove, or to exclude or keep out, competitors from the field of competition in the mass communications market . . . ." (163A)

Lamb argues that these were erroneous instructions because they ignore the fact that section 2 can be violated, not only by a conspiracy to monopolize, but also by one business entity acting alone, which monopolizes or attempts to monopolize. United States v. Griffith, 334 U.S. 100, 106–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 365 F.2d 478, 484 (5th Cir. 1966).

These instructions must be taken as a whole. United States v. Pennsylvania Refuse Removal Assn., 242 F.Supp. 794 (E.D.Pa., 1965). If there was any error in the instruction, any possible prejudice was rendered nonprejudicial by the jury's finding on Special Issue Number 5 that none of the defendants possessed monopoly power. The offense of monopolization requires monopoly power. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The alleged error was rendered nonprejudicial also by the jury's findings on Special Issues Nos. 8, 10 and 11.

In any event, this Court need not reach the question of whether or not these section 2 instructions were improper, because we hold that plaintiffs cannot raise

this claim of error on appeal, for the following reason:

 Plaintiffs alleged in their amended complaint that defendants conspired to violate the anti-trust laws, but never alleged that any single defendant monopolized or attempted to monopolize, in violation of section 2. The trial court is not required to charge the jury on an issue not alleged in the complaint.

In Section VI of Count One of the amended complaint, entitled, "Conduct in Violation of the Sherman Antitrust Act: Conspiracy, Attempt, and Monopolization," the plaintiffs stated:

"On information and belief, plaintiffs allege that:

"Defendants, and each of them, together with other coconspirators, combined, conspired and agreed in restraint of and to monopolize, and attempted to and do monopolize trade and commerce; and the purposes, objects, and effect of said conspiracy, attempt, and monopolization were and are, among others, the following: . . . ." (10A)

Nowhere in the Seven Counts of the amended complaint do plaintiffs charge that section 2 of the Sherman Act was violated in any manner other than by a conspiracy of some or all of the defendants. Consequently, the defendants would not be on notice that they would be expected to litigate issues of monopolization or attempted monopolization by a single defendant, absent a conspiracy or combination. Therefore, plaintiffs cannot assign as error an instruction that satisfies them as to conspiracy, but not as to monopolization or attempt to monopolize by one actor only.

Moreover, from the record before us, it seems that counsel for Lamb acquiesced in the Court's view of these instructions.

The following dialogue occurred between the Court and counsel:

"Mr. Karp: Your Honor, at the conclusion of the Court's discussion of Section 2 of the Sherman Act, the Court concluded, at least in the version that was given to us on Thursday, 'That to prevail on this count of alleged violation'—

"The Court: Just a moment. Let me find it. Title 15, Section 2 of the United States Code, Sherman Anti-Trust Act. All right.

"Mr. Karp:

" 'Plaintiff must prove by a preponderance of the evidence (1) that the defendant or any of them knowingly conspired or combined' and so forth, and so forth; and we submit that Section 2 is violated even in the absence of a combination or conspiracy of two or more of the defendants.

"The Court: Proceed. Do the defendants care to comment on that?

"Mr. Hoerner: To the extent that they proved that—well—it is correct. That is a single defendant can violate Section 2 of the Sherman Act, and we would not contend to the contrary. They are charged violations under all three, charging conspiracy to monopolize. The language is not only apt but required.

"The Court: I think the language that precedes this aspect of it clarifies in the minds of the jury what they are supposed to find. My reaction is —well—going back, it is:

" 'Defendant or any individual or in combination with each other'—but proceed, Mr. Karp."

 Plaintiffs' counsel did not then inform the Court of any objection to the wording of the charge, to let the Court know that the charge still may have been unsatisfactory. We are of the opinion that this did not meet the requirements of Rule 51, Fed.R.Civ.P., which requires:

". . . No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

On this record, then, the trial court would be fully justified in believing that plaintiffs acquiesced in the instruction, and therefore it cannot now be assigned as error.

## XII

In our opinion, Bell was entitled to a directed verdict as there was no evidence connecting it with any conspiracy to exclude Lamb from the CATV business in Toledo.

This left Cox and Blade, the only shareholders of Buckeye, allegedly conspiring between themselves and with Buckeye, but the jury found no such conspiracy existed. In our opinion this finding was the only one which the jury could properly make under the evidence.

The judgment of the District Court is affirmed.