**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4249**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JEAN BROWN,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.   William D. Quarles, Jr., District Judge.  (1:11-cr-00050-WDQ-1)

Argued:  May 15, 2014                     Decided:  July 1, 2014

Before KING, WYNN, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Wynn and Judge Floyd joined.

**ARGUED:** Gary Proctor, LAW OFFICES OF GARY E. PROCTOR, LLC, Baltimore, Maryland, for Appellant.   Peter Marshall Nothstein, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.   **ON BRIEF:** Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

KING, Circuit Judge:

Jean Brown appeals the district court's entry of a criminal judgment against her following a jury trial, whereby she was convicted of conspiring to traffic in 1,000 kilograms or more of marijuana, and of additional charges stemming from the kidnapping and murder of Michael Knight in connection with her trafficking operation. Brown also appeals the sentence of life imprisonment imposed on one of her four convictions. Discerning no cognizable error, we affirm.

I.

The government's evidence at trial demonstrated that Brown was at the forefront of a marijuana trafficking enterprise, in which copious quantities of the drug were smuggled across the border from Mexico and trucked northeast for resale. Brown facilitated her trafficking activities through a number of trucking companies under her control. In the typical instance, drivers hauling perishables across the country would meet the Mexican suppliers in Arizona, conceal the contraband within the legitimate cargo, and return to Baltimore. Some of the marijuana was sold locally, but most of it was redistributed for sale in Pittsburgh and elsewhere. Each month, Brown's operation processed about one ton of marijuana, from which she made about $1 million to finance the next monthly purchase.

The lion's share of the proceeds that Brown did not return to the business made their way to Jamaica, where she invested them in real estate. Brown was born in Jamaica, but came to the United States as an adult in 1994 or 1995 to reside for a time in Miami. Brown moved to the Baltimore area in about 2000 and began to build her drug trafficking operation, though she maintained connections with Florida and returned there frequently. In 2006, having wed an American husband some years earlier, Brown herself became a United States citizen through naturalization.

On Christmas Day, 2008, Michael Knight and two others were caught at Montego Bay attempting to enter Jamaica with about $565,000 in cash from Brown's trafficking proceeds. The authorities confiscated the entire sum. Almost a year later, on December 16, 2009, Knight again ran afoul of Brown when he failed to account for $250,000 of $1 million in cash that he was supposed to be holding for her. Upon discovering the shortfall, Brown enlisted Carl Smith and Dean Myrie to help her pick up Knight and transport him, bound with a telephone cord, to an apartment in the White Marsh area of Baltimore County. When it became apparent that Knight would not produce the missing funds or disclose their location, Brown summoned Peter Blake and Huber Downer to stab Knight to death in the apartment's bathtub.

Blake, Downer, and Myrie then dismembered Knight's corpse and disposed of it in dumpsters throughout the Baltimore area.

The government's investigation of the 2008 Jamaica interdiction and concomitant seizure of Brown's trafficking proceeds resulted in her indictment on July 14, 2010, for bulk cash smuggling, see 31 U.S.C. § 5332, and for conspiracy to commit the same. About three weeks afterward, Brown was arrested in Florida and brought to Maryland for arraignment and detention. Brown retained a Fort Lauderdale lawyer to defend her, and, with counsel's assistance, she pleaded guilty to the substantive cash smuggling count on October 13, 2010. Seeking sentencing credit, Brown had her lawyer arrange a police station interview that same day with Baltimore County detectives investigating the Knight murder. Counsel did not attend the interview with his client, however, electing instead to board a return flight to Florida. The October 13 interview led to another on November 3, 2010, which again was conducted outside the presence of counsel. Brown was advised of her constitutional rights prior to each interview, see Miranda v. Arizona, 384 U.S. 436 (1966), and, on both occasions, she agreed to talk to the detectives without her lawyer present.

Not long thereafter, on February 1, 2011, the grand jury returned a new indictment against Brown. In the operative Fourth Superseding Indictment of August 21, 2012, Brown was

4

charged in Count One with conspiracy to traffic in marijuana, see 21 U.S.C. §§ 841(a)(1), 846; in Counts Two and Four with respectively, kidnapping and murdering Knight in aid of racketeering, see 18 U.S.C. § 1959(a)(1); and in Count Three with conspiracy to commit murder in aid of racketeering, see id. § 1959(a)(5). Brown, having retained new counsel, moved to suppress certain of her pretrial statements, including those she made during the interviews at the police station. Following a hearing on January 4, 2013, that motion was denied.

Trial commenced before a jury in Baltimore on February 4, 2013. Brown was tried alongside Gabrial Campa-Mayen, a Mexican intermediary indicted for his role in the drug conspiracy. A number of Brown's former associates testified for the government, relating the details of her marijuana trafficking operation and its breadth. Blake, Downer, and Myrie corroborated the other witnesses' testimony on that point, and they elaborated in detail on Brown's involvement in Knight's murder.

During its examination of one of the County detectives, the government played recorded video excerpts of the police station interviews. The recordings revealed that Brown did not comport herself well during the detectives' questioning, coming across as evasive and less than forthright. Later, the government would argue to the jury that Brown's story toward the end of the

5

recording was "a far cry from where we started . . . where she didn't know anything about anything, and it's a far cry from what she said at each successive stage in her description of the events to the detectives." J.A. 1758.[1] The government emphasized that, as the interviews progressed, Brown "eventually admitted every fact of the murder except for her own involvement." Id.

Brown testified in her own defense. Upon ascending the witness stand, she continued to assert her innocence, insisting that she had no association with drug trafficking or complicity in Knight's death. According to Brown, Knight had been restrained and threatened after he failed to account for Smith's money. Brown and Myrie left the White Marsh apartment for a time to drive Smith to a truck stop, where he was embarking on a trip to Arizona; Knight remained in the apartment, in the custody of Blake and Downer. Brown returned to the apartment with Myrie to discover that Knight had been killed, with Blake taking the credit.

Following the close of all the evidence, during the charging conference on February 13, 2013, a question arose concerning the proper calculation in kilograms of the drug

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

6

quantity attributable to the conspiracy. The question was significant, because if Brown were convicted of conspiring to traffic in 1,000 kilograms or more of marijuana, she would be susceptible to imprisonment under the applicable statute from ten years to life. See 21 U.S.C. § 841(b)(1)(A). If, on the other hand, the conspiracy were found to involve less than 1,000 kilograms (but more than 100), the prescribed statutory range would be five to forty years. See id. § 841(b)(1)(B). The resolution of the drug quantity — either way — was exclusively the province of the jury. See Alleyne v. United States, 133 S. Ct. 2151, 2160 (2013) (instructing that "any 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime" that must be found by a jury beyond a reasonable doubt) (quoting Apprendi v. United States, 530 U.S. 466, 490 (2000)).

At one point during the discussion, the government asked the district court to "just . . . tell the jury that 1,000 kilograms equals 2,200 pounds, because the testimony had been in English as opposed to metric units." J.A. 1692-93. In response to the government's request, counsel for Brown expressed some reservations:

> COUNSEL: And judge, I don't have the exact version right, but I don't want some [28 U.S.C. §] 2255 lawyer saying it was 2,200 point —
>
> THE COURT: One kilo is 2.2 pounds.

7

```
COUNSEL:     Exactly?   There isn't a few ounces either
             way?

THE COURT:   Exactly, I think.   That's the one.

COUNSEL:     Well, if that's a correct statement of the
             law, we have nothing additional.

THE COURT:   I think it's a correct statement on the
             measurement as well.
```

Id. at 1693.

The district court, however, turned out to be incorrect: 2,200 pounds equates to a metric mass of just less than 998 kilograms, more than two kilograms short of the minimum quantity necessary to bring into play the possibility of life imprisonment under the sentencing statute. In order for the court to properly sentence Brown in accordance with the 1,000-kilogram threshold, the government was required to prove that the conspiracy involved a drug weight of at least 2,204.63 pounds. The jury was presented with no evidence to assist it in precisely converting from the English system to its metric counterpart the drug quantities of which the witnesses testified.[2]

---

[2] Prior to being instructed, all the information the jury possessed on the subject had been given to them in the form of comments and argument from counsel. The first instance involved a government witness who had pleaded guilty to conspiring to distribute more than 100 kilograms of marijuana. One of Brown's lawyers asked the witness whether he knew how many pounds are in a kilogram. When the witness replied in the negative, counsel
(Continued)

The district court's approval of the government's request was the last word on the matter, and, upon charging the jury the next morning, it gave Instruction 48 as follows: "The purpose of the conspiracy charged in Count 1 was to distribute, or possess with intent to distribute, 1,000 kilograms — that's 2,200 pounds — or more of marijuana." J.A. 1897. Without objection, the court proceeded with the remainder of the instructions. The jury retired to deliberate afterward, having been given the parties' agreed verdict form, which, among the drug quantity options, listed "1000 kilograms (2200 pounds) or more." Id. at 1955.

The jury deliberated for almost two hours, then requested to view again an excerpt from the video of Brown's November 3, 2010 police station interview. About twenty minutes into the playback, the government paused the recording so that the district court could ask the jury how much of the remainder it wished to review. At that point, the court informed the jury that "I have to step off for a brief period. The recording will

_____

informed him that the amount was approximately 220 pounds. See J.A. 785-86. The government, for its part, reminded the jury at closing argument that Brown had been charged with "a conspiracy to distribute more than a thousand kilograms, which is the same as 2,200 pounds." See id. at 1734. Shortly thereafter and twice more on rebuttal, the government repeated the same erroneous assertion. See id. at 1739, 1856-57. None of the government's misstatements drew an objection from the defense.

9

continue to play in my absence, and [the courtroom clerk] will get me if I'm needed." J.A. 1936. The recording resumed, absent the court, for approximately thirty-two minutes. Upon the court's return, Brown moved for a mistrial, which was denied.[3]

On February 19, 2013, the trial having recessed four days for the holiday, the jury reached its verdict. The courtroom clerk made official inquiry of the jury's foreperson:

> THE CLERK: How do you find the Defendant Jean Brown, not guilty or guilty, of the matters wherefore she stands indicted as to Count [One]?
>
> FOREPERSON: Guilty.
>
> THE CLERK: Okay. And what amount of marijuana was involved?
>
> FOREPERSON: 2,200 pounds.
>
> THE CLERK: 2,200 pounds.
>
> FOREPERSON: Or more.

J.A. 1946. The jury also found Brown guilty of Counts Two through Four, relating to the kidnapping and murder of Knight.

---

[3] Inviting our attention to the district court docket, Brown expresses her belief that the court "left the bench in the case at bar to conduct a sentencing in another unrelated case, in an adjacent courtroom." Br. of Appellant 18 n.3 (citing United States v. Chon, No. 1:12-cr-00506 (D. Md. Feb. 14, 2013), ECF No. 23).

At the sentencing hearing on March 22, 2013, Brown maintained that, with respect to her conviction of the marijuana trafficking conspiracy, she should not be subjected to the ten-year-to-life term of imprisonment prescribed by 21 U.S.C. § (b)(1)(A). Brown contended that, because of the erroneous equivalency instruction and verdict form, the jury had not actually found that she had distributed the threshold quantity of marijuana authorizing a life sentence. The district court was unpersuaded, sentencing Brown to life on the Count One marijuana conspiracy, to concurrent life terms on the substantive murder and kidnapping charges in Counts Two and Four, and to a concurrent term of 120 months for her conviction of the Count Three murder conspiracy. By timely notice filed March 28, 2013, Brown appeals her convictions and sentence.

II.

Brown asserts that the district court erroneously permitted the jury to view the recorded October 13 and November 3 police station interviews. More fundamentally, Brown posits that her trial was structurally undermined by the court's absence while the jury listened to the latter interview on playback. Either of those supposed irregularities, according to Brown, renders her convictions infirm and entitles her to a new trial. Failing that, Brown suggests that the uncertainty surrounding the jury's

11

verdict as to the drug quantity attributable to the conspiracy requires a remand. Specifically, Brown requests that she be resentenced on Count One in accordance with the more lenient five-to-forty year range set forth in § 841(b)(1)(B) for a quantity of marijuana amounting to at least 100 kilograms, but less than 1,000.

In evaluating Brown's appeal of the denial of her motion to suppress the recorded police interviews, we review the district court's factual findings for clear error and its legal conclusions de novo. See United States v. Williams, 740 F.3d 308, 311 (4th Cir. 2014). We likewise review de novo allegations of structural defects in the trial process, see United States v. Mortimer, 161 F.3d 240, 241 (3d Cir. 1998). If the purported defect is not structural and has not been preserved via objection in the district court, we review for plain error only. See United States v. Love, 134 F.3d 595, 605 (4th Cir. 1998).

A trial judge's absence from the bench may, depending on the circumstances, constitute a structural error that is reversible per se. See Love, 134 F.3d at 604-05 (citing Riley v. Deeds, 56 F.3d 1117, 1120 (9th Cir. 1995)); see also Mortimer, 161 F.3d at 241. An error in contravention of Apprendi and its progeny, however, is not a structural one. See United States v. White, 405 F.3d 208, 222 (4th Cir. 2005)

12

(citing United States v. Carter, 300 F.3d 415, 428 (4th Cir. 2002)).  Irregularities of the Apprendi sort may therefore be reviewed for harmlessness, or for plain error if not timely objected to in the trial court.  See White, 405 F.3d at 223; United States v. Mackins, 315 F.3d 399, 408-09 (4th Cir. 2003).

III.

A.

The government could only use Brown's custodial statements at trial insofar as they were made voluntarily, in conformance with the Fifth Amendment's privilege against compelled self-incrimination.  See United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc).  Brown does not contest the validity or adequacy of the Miranda warnings administered to her by the Baltimore County detectives.  Instead, Brown's assertion of a Fifth Amendment violation begins with a uniquely Sixth Amendment premise:  that the lawyer who represented her in the cash smuggling prosecution was constitutionally ineffective by failing to accompany her to the police station, where she was questioned about uncharged criminal activity.  The neglect of her Florida counsel, according to Brown, left her helpless before the police and rendered involuntary the entirety of her statements during the interviews of October 13 and November 3, 2010.

13

Brown's theory of involuntariness is not one that we are prepared to embrace. Indeed, "[t]he sole concern of the Fifth Amendment . . . is governmental coercion." Colorado v. Connelly, 479 U.S. 157, 170 (1986). That is to say, "[t]he voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id. Were it otherwise, we would risk imposing "a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." Id. at 165-66.

Moreover, we routinely decline to address on direct appeal a criminal defendant's contention that counsel has performed in an ineffective manner, unless "the lawyer's ineffectiveness conclusively appears from the record." United States v. Bernard, 708 F.3d 583, 593 (4th Cir. 2013). We see no reason to depart from such a settled rule, notwithstanding that Brown's suggestion of ineffective assistance does not serve as a stand-alone Sixth Amendment assignment of error, but is instead asserted as a predicate to relief under the Fifth Amendment. Although Florida counsel testified at the suppression hearing, and, as a result, the record is more thoroughly developed here than may be typical for a direct appeal involving a lawyer's performance, we yet cannot say that the materials before us

14

conclusively establish the truth of Brown's allegations of ineffectiveness. That Brown agreed to be interviewed outside the presence of counsel is patently insufficient, as pointed out by the Supreme Court in McNeil v. Wisconsin:

> One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution. It can be said, perhaps, that it is likely that one who has asked for counsel's assistance in defending against a prosecution would want counsel present for all custodial interrogation, even interrogation unrelated to the charge. That is not necessarily true, since suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions.

501 U.S. 171, 178 (1991).

The McNeil Court appears to have captured the essence of the case at bar. Brown's Florida counsel, by not insisting that he accompany her to the police station interviews, may well have unwittingly enabled his client's misbegotten belief that she could talk her way out of the trouble that was looming. A mere breakdown in communication between Brown and her lawyer, however, does not compel the conclusion that the latter was constitutionally ineffective. There being no legitimate basis to suppress the recordings of the interviews, the district court did not err in admitting them.

### B.

With respect to Brown's assertion of structural error emanating from the district court's vacation of the bench, we

15

note first that the record reflects no contemporaneous objection to the court's absence. See Fed. R. Crim. P. 51(b) (specifying that "[a] party may preserve a claim of error by informing the court — when the court ruling or order is made or sought — of . . . the party's objection to the court's action and the grounds for that objection"). A motion for mistrial made substantially after the fact is an inadequate substitute for a timely objection. See United States v. Brainard, 690 F.2d 1117, 1122 n.7 (4th Cir. 1982).

Counsel for Brown, without contradiction by the government, informed us at oral argument that the trial participants were momentarily taken aback by the district court's departure, which occurred without warning and was facilitated by an exit to chambers in proximity to the bench. Counsel's version of events recalls those in United States v. Mortimer, in which the prosecutor objected to a portion of the defendant's closing argument, then immediately withdrew the objection upon noticing that the judge "had indeed disappeared. He had given no notice to counsel or the jury that he was about to depart. He was simply gone." See 161 F.3d 240, 241 (3d Cir. 1998). The resultant structural defect could not be excused by the defendant's implied consent, manifested by his counsel's determination to forge ahead in the judge's absence, for, as the Third Circuit mused:

> Before whom was defense counsel to offer consent? That defense counsel continued her summation cannot be construed as consent. Was she to stop in midsentence as it were and wait for such time as the judge should reappear? She did her best under the circumstances but her carrying on in adversity cannot be turned into agreement to the judge's absence.

Id.; see also Fed. R. Crim. P. 51(b) (instructing that "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party").

Even so, we do not imagine that resourceful counsel would necessarily have been stymied if confronted with the undesirable situation that occurred here. The defense and the prosecution should have each realized the peril in which their respective cases were placed by the district court's desertion. As officers of the court, either (or preferably both, acting in concert) would have acted well within his purview by standing up, stopping the playback, and having the clerk sequester the jurors until the presiding judge could be retrieved. No doubt the resultant hubbub would engender a modicum of chaos and confusion in the courtroom, but that sort of ephemeral ruckus is to be preferred to the lingering spectacle of no one presiding over the trial of a federal criminal defendant whose freedom is at stake.

In United States v. Love, 134 F.3d 595 (4th Cir. 1998), we recognized that the absence of the district court from a portion

of trial is not always a structural defect. The court in Love left the bench prior to the parties' closing arguments, reassuring the jury that it would be available to rule on any objections, though none were ultimately made. On appeal, the defendants contended that the court's departure was error per se, entitling them to a new trial. See Riley v. Deeds, 56 F.3d 1117, 1120 (9th Cir. 1995) (granting writ of habeas corpus to petitioner convicted of sexual assault and kidnapping where law clerk convened court in judge's absence to comply with jury's request to read back victim's testimony). We disagreed:

> While we do not condone the absence of the trial judge from any phase of the trial proceeding, we reject defendants' attempt to characterize the district judge's absence here as structural error. The Riley court instead rested its holding on the fact that the trial judge there was not only physically absent from the courtroom; he did not even make the decision to permit relevant testimony to be read back to the jury or delineate which portions thereof should be presented to it. All of the above functions were instead carried out by the judge's law clerk, as the judge could not be located.

Love, 134 F.3d at 604-05. The exacerbating facts in Riley, we reasoned, made clear that the Ninth Circuit had premised its grant of the Great Writ on the "'complete abdication of judicial control over the process.'" Id. at 605 (quoting Riley, 56 F.3d at 1121). We observed that "[t]hose circumstances were not present" at the defendants' trial in Love. Id.

18

Nor were they present at Brown's trial.  Both here and in Love, the district court was absent for a relatively short time after all the evidence had been presented; no rulings were requested during the court's absence, and, fortunately, nothing else of note occurred in the courtroom.  In Riley, by contrast, the judge's law clerk granted the jury's request to read back the victim's testimony, and, in Mortimer, the prosecutor was constrained to withdraw his objection when no one in authority was there to rule on it.  Although our analysis in Love was conducted using a plain-error standard of review, meaning that the burden was on the defendants to demonstrate that the court's absence affected their substantial rights, see United States v. White, 405 F.3d 208, 223 (4th Cir. 2005), the prejudice inquiry "is essentially the same as the question whether nonforfeited error was harmless," where the government shoulders the burden, id.  We are therefore content to say that our decision in Love compels the conclusion that the error complained of here was harmless.

C.

The circumstances surrounding the district court's sudden absence from the bench may have muddied the water in that instance as to the need for counsel to have blurted out an objection to preserve the irregularity.  No similar lack of clarity, however, obfuscates our view of the court's inaccurate

19

drug quantity instruction and attendant verdict form error that are alleged to have led the jury astray. A fair reading of the trial transcript reveals that counsel for Brown identified the potential pitfall of the English/metric conversion rate, but then deferred to — and ultimately accepted without further question — the court's resolution grounded in its imperfect recollection.

The court of appeals in Lamb Enterprises, Inc. v. Toledo Blade Co., 461 F.2d 506 (6th Cir. 1972), addressed an analogous situation. In Lamb, a private antitrust action, the plaintiffs took issue with the district court's proposed instruction conditioning the defendants' liability under Section 2 of the Sherman Act on a finding of conspiracy to monopolize their local cable television market, excluding the alternative bases that any single defendant actually attained a monopoly or attempted to do so. Counsel for the plaintiffs maintained that "Section 2 is violated even in the absence of a combination or conspiracy of two or more of the defendants." Id. at 520. Asked to respond, their counterparts on defense acknowledged that "a single defendant can violate Section 2 of the Sherman Act, and we would not contend to the contrary." Id.

The district court, however, appeared to misapprehend the gist of the discussion, perhaps surmising that the plaintiffs sought to clarify that the jury would be within its rights to

20

return a conspiracy verdict against just one of the several defendants. In any event, the court opined that language elsewhere in the instructions directing the jury to evaluate the liability of each defendant by its own acts, or by "any individual or in combination with each other," was sufficient to allay the plaintiffs' concerns. Id. On appeal, it was noted that "counsel did not then inform the [trial] Court of any objection to the wording of the charge, to let the Court know that the charge still may have been unsatisfactory." 461 F.2d at 520. Consequently, the Sixth Circuit ruled that counsel for the plaintiffs "acquiesced in the [district] Court's view of these instructions." Id.

The same result obtains here. As to the unconsummated preservation of the asserted Apprendi error, we may say that Brown cast her bait, reeled in her catch, then — deeming it too insubstantial to keep — threw it back. It would have been a simple matter indeed for someone in the courtroom to have used a cell phone, computer, or even an old-fashioned printed reference to quickly and authoritatively ascertain the accurate conversion calculation of a pound to a kilogram, of which the district court could have properly taken judicial notice. That someone did not surely indicates that all parties were content with the court's flawed methodology. Moreover, Brown lent her imprimatur to the verdict form submitted by the government that contained

21

the same misinformation.  See J.A. 1715-16; cf. Nehi Bottling Co., Inc. v. All-American Bottling Corp., 8 F.3d 157, 164 (4th Cir. 1993) (upholding jury verdict premised on unclear instructions where appellant "not only failed to object to the instructions, [but] actually approved them").  Having failed to interpose a proper objection, Brown may be resentenced on Count One only if the district court's drug quantity instruction constituted plain error.

Thus, to obtain relief, Brown must demonstrate "that the district court erred, that the error was plain, and that it affected his substantial rights."  United States v. Robinson, 627 F.3d 941, 954 (4th Cir. 2010) (citing United States v. Olano, 507 U.S. 725, 734 (1993) (internal quotation marks omitted)); see Fed. R. Crim. P. 52(b) (providing that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention").  If the initial three Olano prongs are met, we yet possess "discretion whether to recognize the error, and should not do so unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  United States v. Dyess, 730 F.3d 354, 361 (4th Cir. 2013) (citation and internal quotation marks omitted).

We have adhered to the Supreme Court's admonition that "Apprendi errors under § 841(b) should not be recognized on

22

plain error review when the evidence as to drug quantity was 'overwhelming' and 'essentially uncontroverted.'" Dyess, 730 F.3d at 361 (quoting United States v. Cotton, 535 U.S. 625, 633 (2002)). When the evidence admits of only one result, there is simply "'no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings.'" United States v. Mackins, 315 F.3d 399, 408 (4th Cir. 2003) (quoting Cotton, 535 U.S. at 633 (internal quotation marks and alteration omitted)). In Dyess and Mackins, as has become our practice in cases like Brown's involving an obvious Apprendi error that fulfills the initial two Olano prongs, we deferred an examination of the third — whether the error affected the defendant's substantial rights — in favor of asking ourselves whether, in accordance with Cotton, we would in any event choose to exercise our discretion under the fourth prong to correct the error.

In the case at bar, the government presented evidence that Brown began to traffic in marijuana soon after her arrival in Baltimore in 2000, see J.A. 804, and that she continued to do so in earnest for the next ten years, until shortly before her arrest in 2010. The quantities were relatively modest — albeit substantial — during the first year or so, amounting most months to perhaps 200 to 500 pounds. See id. By 2005 or 2006, the monthly quantity had increased substantially, to about 500 to

23

1,000 pounds.  See id. at 811.  According to several of her co-conspirators (including Blake and Downer), Brown confided to them during the later years of her operation that she bought and sold from 1,000 to 2,000 pounds of marijuana each month.  See id. at 444, 478, 630.  The government's evidence was uncontroverted except for Brown's denials, which were obviously given no credence by the jury.

Even were we to afford Brown every benefit of the doubt, the government proved that the conspiracy trafficked in tens of thousands of pounds of marijuana over its ten-year course, amounting to many multiples of the quantity required to impose a life sentence.  That reality was hardly lost on the jury, whose foreperson made it a point in open court to respond in kind to the clerk's oral verification of the 2,200 pounds indicated in writing on the verdict form by speaking the two words:  "Or more."  We are therefore persuaded that Brown's sentence is not among those contemplated by Cotton as one that we should choose to disturb.

## IV.

Pursuant to the foregoing, we are satisfied to affirm Brown's convictions and sentence.

AFFIRMED

24