ON REHEARING EN BANC

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4104

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

PRECIAS K. FREEMAN,

Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Spartanburg. Timothy M. Cain, District Judge. (7:17-cr-00079-TMC-1)

Argued: October 26, 2021                                        Decided: January 25, 2022

Before GREGORY, Chief Judge, WILKINSON, NIEMEYER, MOTZ, KING, AGEE, WYNN, DIAZ, THACKER, HARRIS, QUATTLEBAUM, and RUSHING, Circuit Judges, and FLOYD, Senior Judge.

Vacated and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judges Motz, King, Wynn, Diaz, Thacker, Harris, and Senior Judge Floyd joined. Judge Quattlebaum wrote a dissenting opinion, in which Judges Wilkinson, Niemeyer, Agee, and Rushing joined.

**ARGUED:** Hannah Rogers Metcalfe, METCALFE & ATKINSON, LLC, Greenville, South Carolina, for Appellant. William Jacob Watkins, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee. **ON BRIEF:** Peter M. McCoy, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

GREGORY, Chief Judge:

Precias Freeman became addicted to opioids when she was prescribed them for a legitimate injury as a teenager. J.A. 129, 237. Shortly thereafter, and with the facilitation of medical professionals, Freeman began filling, and eventually selling, fraudulent prescriptions. J.A. 237. In 2017, Freeman pleaded guilty without the benefit of a plea agreement to an indictment charging her with possession with intent to distribute hydrocodone and oxycodone, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and she was sentenced to serve more than seventeen years in prison. J.A. 11, 75, 145–46. A new attorney was appointed to handle Freeman's appeal. Appellate counsel then submitted an *Anders* brief requesting this Court's assistance in identifying appealable issues, and we directed counsel to brief whether Freeman received effective assistance of counsel and whether her sentence is substantively reasonable. We hold that Freeman did not receive effective assistance of counsel and, therefore, vacate her sentence and remand for resentencing.

I.

Freeman was first prescribed opioids as a teenager after she fell in the shower while pregnant and broke her tailbone. J.A. 129, 237. Shortly thereafter, the doctor for whom she worked at the time gave her blank prescriptions and permitted her to write her own prescriptions for the pain medication Lortab. J.A. 237. Around 2001, while working at another medical practice, Freeman started printing duplicate prescriptions for patients prescribed opioids and keeping one for herself. J.A. 238. Once she filled these duplicate prescriptions, she would use half of the pills and sell the other half to an acquaintance who

2

worked as a lab technician at a hospital. J.A. 238. She eventually began writing forged prescriptions. J.A. 238. Over time, Freeman's fraudulent prescriptions contained more and more pills at higher and higher concentrations. J.A. 238–40. While she continued to sell some pills, she also increased her personal use, and, by February 2015, she was taking sixty to eighty tablets per day. J.A. 240

In 2008 and 2011, Freeman's conduct resulted in state convictions for obtaining fraudulent prescriptions and related crimes. J.A. 210–11. Her criminal record also shows additional, similar state charges that the state declined to prosecute. J.A. 212–13. All of Freeman's prior criminal conduct relates to using and selling opioids. J.A. 210–12. During her years of addiction and criminal activity, however, there is no indication that Freeman was ever violent or associated with anyone engaged in violence. *See, e.g.*, J.A. 210–15. Nor was she enriched by her drug sales; she could not afford her own car. J.A. 129.

Relevant to this appeal, Freeman was arrested on state charges on October 2, 2016, after a Walgreen's pharmacist recognized her and called the police. J.A. 206, 235. She was then transported to a hospital, where she tested positive for opiates. J.A. 235. That same day, state investigators interviewed Freeman at the hospital. J.A. 235. During this interview, she admitted that "on a good week she gets approximately 21 (twenty-one) forged prescriptions filled, and about 7 (seven) forged prescriptions on a bad week." J.A. 235. While Freeman was incarcerated on the pending state charges, a federal grand jury returned an indictment charging her with possession with intent to distribute hydrocodone and oxycodone between October 2014 and October 2016. J.A. 11; *see also* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

3

On June 6, 2017, Freeman pleaded guilty to the charges. J.A. 4. While awaiting sentencing, Freeman spoke to a Drug Enforcement Administration (DEA) agent pursuant to a standard proffer agreement. J.A. 237. At this interview, Freeman stated that, during the relevant period, she was filling "one prescription per day, four to five days per week" and occasionally four to five prescriptions in a single day. J.A. 240. Each filled prescription contained 120 10mg hydrocodone pills. J.A. 240. In total, Freeman conservatively estimated that she sold 52,000 pills to her buyer between October 2014 and October 2016. J.A. 240.

Yet no agreement ultimately emerged from Freeman's proffer. In August 2017, while released on bond and awaiting sentencing, Freeman failed a drug test and admitted she had taken Lortab. J.A. 206–07. Based on the failed test, the court modified Freeman's bond on September 7, 2017, to require location monitoring with GPS. J.A. 207. During this same time period, public records confirm that Freeman and her family were evicted from their apartment. J.A. 244. They began living in hotels near her hometown of Shelby, North Carolina, about 40 miles away from their former home in Spartanburg, South Carolina. J.A. 117, 131–32. As Freeman explained to the district court at her sentencing, her family—including four children and a pregnant Freeman—left because they "didn't have anywhere to go." J.A. 131. Freeman remained in and around Shelby with her family until she was rearrested in March 2018. *See* J.A. 117, 207. Freeman also gave birth during this time. J.A. 116–17. The docket does not reflect that Freeman missed any court dates between September 2017 and March 2018. J.A. 4–5.

4

In July 2018, a few months after she was rearrested, Freeman appeared before the district court for a sentencing hearing. Based on Freeman's statement, given to state police while she was hospitalized and positive for opioids, that "on a good week she gets approximately 21 (twenty-one) forged prescriptions filled, and about 7 (seven) forged prescriptions on a bad week," J.A. 235, her probation officer estimated that Freeman had successfully filled one prescription per day every day for two years. J.A. 79–80 ("[S]he only had success typically with about one per day."). Accordingly, the initial presentence report (PSR)[1] held Freeman responsible for obtaining with intent to distribute 87,600 tablets of hydrocodone—the equivalent, for purposes of sentencing, of 5,869.2 kilograms of marijuana. J.A. 80. The initial PSR did not reduce this number to reflect Freeman's own use of the pills. See J.A. 79–82. The final calculated drug weight corresponded to a base offense level of thirty-two. J.A. 81–82.

At the hearing, Freeman raised questions about the drug weight assessed in the initial PSR. J.A. 77–79, 81. She also informed the district court that she had been unable to contact counsel until shortly before the hearing and that she disagreed with her counsel about how best to proceed with her case. J.A. 83–84. In response, the district court continued the hearing to allow Freeman's family to hire another attorney to represent her. J.A. 5, 85–86. The district court also noted that the government could, in the meantime, "revisit" the calculated drug weight based on the information in Freeman's proffer. J.A.

---

[1] The initial PSR is inexplicably missing from the record, but some of its contents were discussed at Freeman's initial sentencing hearing. See J.A. 78–82.

83–85.  The court's intention that the PSR would be revised based on the proffer was even memorialized on the docket.[2]  J.A. 5.

Freeman's probation officer did revise the PSR, but not based on Freeman's proffer. In the new report, the probation officer "conservative[ly]" estimated that Freeman successfully filled two prescriptions, consisting of 120 10mg pills, 365 days per year for two years—again without accounting for Freeman's personal use of the pills.  J.A. 209. That quantity of drugs, 175,200 pills, is the equivalent, for purposes of sentencing, of 11,738.4 kilograms of marijuana.  J.A. 209.  Accordingly, the probation officer assigned Freeman a base offense level of thirty-four.  J.A. 209.  The estimated number of pills was, therefore, more than double the 52,000 pills that Freeman estimated she had sold in a statement given as part of her proffer.  *See* J.A. 240.  Further, in discovery, the government only provided evidence of fewer than sixty fraudulent prescriptions filled by Freeman during the relevant period, including evidence that she filled five prescriptions on December 1, 2014, and thirteen prescriptions on December 30, 2014.  J.A. 207–08, 252–59.

The probation officer further recommended that Freeman receive a two-level increase in her offense level for obstruction of justice based on her move to North Carolina and, as a result, recommended that Freeman also not receive a potential three-level decrease in her offense level for acceptance of responsibility based on her admission of criminal

---

[2] The docket entry accompanying the minute entry for the proceedings of the hearing states:  "Defendant requests time to hire counsel and objects to drug weight.  Drug weight will be recalculated . . . in regards to her guilty plea proffer."  J.A. 5.

conduct and timely guilty plea. J.A. 210. Freeman's recalculated overall offense level was thirty-six. J.A. 216.

Prior to Freeman's rescheduled sentencing hearing, Freeman's new attorney filed several objections to the revised PSR related to Freeman's failed drug test; the government's lack of evidence for its calculated drug weight; and the facts relating to the obstruction of justice enhancement. J.A. 242–61. But on the day of the hearing, he waived these objections, apparently to Freeman's surprise. *See* J.A. 108–09. Freeman's counsel told the district court that he was waiving the objections because they "might be considered as minimal"; would not "take[] away from the vast number of pills that the Government has accused her of dispersing or acquiring"; were "not going to change, in essence, what the charges are"; and would not "reduce the number that is relevant to this [c]ourt." J.A. 107–08. When the district court asked Freeman if she agreed with waiving the objections, she initially responded, "I'm not sure." J.A. 108. But after speaking with counsel, Freeman agreed to the waiver. J.A. 110. As a result, the court adopted the factual findings set forth in the PSR. J.A. 111.

Instead of pursuing these objections, Freeman's counsel relied entirely on a motion to enter a drug court diversion program (the "BRIDGE program") that could have permitted Freeman, if admitted, to enter treatment instead of going to prison. *See* 107, 114–21 ("[W]e believe that the drug court or some of the arguments made in the drug court are what is more pertinent than objections . . . ."). Emails in the record suggest that counsel did not understand how to obtain entry into the program or what the district court would need in order to grant a motion to enter it; he wrote in an email to the program's supervising

7

probation officer that he was "not completely sure of the parameters of the drug court." J.A. 184. Months later, and shortly before Freeman's sentencing hearing, he sent a second email in which he asked the officer to "point me in the right direction as to what the [c]ourt looks for in giving applicants the opportunity." J.A. 185.

Freeman also spoke at the hearing. *See* J.A. 128–35. She described the events that led to her addiction, and the devastating consequences on her life.[3] J.A. 128–29. She also explained the circumstances that led to her family's move to North Carolina in September 2017, including their eviction. J.A. 131–32 ("We had to be out of our apartment by the 8th. . . . The only hotel we could find was in Shelby."). Finally, she apologized to her family and to the court for her actions and asked the court for mercy. J.A. 131–32.

The district court summarily denied the motion for the BRIDGE program and sentenced Freeman to 210 months, the bottom of the applicable Sentencing Guidelines range based on the final offense level of thirty-six recommended in the PSR. J.A. 140–41. Following the hearing, Freeman's counsel filed a petition for rehearing or motion for reconsideration "pursuant to Federal Rule of Civil Procedure Rule 59(e)," which does not

---

[3] Freeman explained to the court that during the relevant time period she had been taking sixty to eighty pills a day and stated:

> Yes, I have used pills for a long time. In 2000, I fell in the shower, broke my tailbone, I was seven months pregnant with my daughter, and my OB/GYN put me on what, at the time, was Lortabs, and I have been hooked ever since then. . . . I have had to go through withdrawals before, and going through withdrawals is like death itself. There is no way to explain it if you have never been through it. So, yeah, everyday I woke up, that was the first thing on my mind was how do I not have to feel like I am about to die.

J.A. 128–29.

8

apply in criminal proceedings. J.A. 151–66. The district court broadly construed the motion as one to modify the sentence under Federal Rule of Criminal Procedure 35 but denied the motion because it found that Freeman's counsel had not informed the court of any "arithmetical, technical, or other clear error" within the ambit of Rule 35. J.A. 200.

Freeman then filed a *pro se* Notice of Appeal on February 12, 2019. J.A. 202–03.

## II.

Criminal defendants have a Sixth Amendment right to the effective assistance of counsel at all critical stages of a criminal proceeding, including at sentencing. *Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *see also Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish an ineffective assistance of counsel claim, a defendant must show (1) that counsel's performance was not objectively reasonable and (2) that counsel's deficient performance prejudiced him. *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017) (citing *Strickland*, 466 U.S. at 687–88). Since Freeman's ineffective assistance claim is made on direct appeal, we review it *de novo*, and we will reverse only if it "*conclusively appears in the trial record itself* that the defendant was not provided . . . effective representation." *United States v. Fisher*, 477 F.2d 300, 302 (4th Cir. 1973) (emphasis added) (quoting *United States v. Mandello*, 426 F.2d 1021, 1023 (4th Cir. 1970)); *see also United States v. Faulls*, 821 F.3d 502, 507–08 (4th Cir. 2016).

## A.

"Counsel must demonstrate a basic level of competence regarding the proper legal analysis governing each stage of a case," including the sentencing phase. *Carthorne*, 878

F.3d at 466. And counsel's performance is constitutionally deficient if he fails to act according to "the duty to investigate and research a client's case in a manner sufficient to support informed legal judgments." *Id.* Thus, counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). As we have previously recognized, "[u]nder this standard, counsel may be constitutionally required to object when there is relevant authority strongly suggesting that a sentencing enhancement is not proper." *Carthorne*, 878 F.3d at 466. And "the failure to raise an objection that would be apparent from a thorough investigation is a significant factor in evaluating counsel's performance." *Id.* at 467.

Of course, this Court's scrutiny of counsel's performance "must be highly deferential," and we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 691. But we do "not regard as tactical a decision by counsel if it made no sense or was unreasonable." *Vinson v. True*, 436 F.3d 412, 419 (4th Cir. 2006).

Freeman's counsel was unequivocally wrong on the law when he waived her meritorious objections to the PSR on the ground that "none of those objections reduce the number that is relevant to this [c]ourt." J.A. 108. In fact, if successful, Freeman's

objections would have reduced the low end of her Sentencing Guidelines range—the "number that is relevant to th[e] court" at sentencing—by almost ten years.[4]

First, Freeman's counsel waived a meritorious objection to the PSR's calculated drug weight. At her initial sentencing hearing, the government agreed to revise the drug weight in Freeman's initial PSR based on a statement she made as part of her proffer. J.A. 85 ("I would ask [Freeman's probation officer] to get with [the relevant agent from DEA diversion] and go over the numbers and additional information from that proffer and see if that changes the drug weight one way or the other . . . ."); *see also* J.A. 5. Had it done so, Freeman's base offense level would have been unchanged at thirty-two.[5]

Instead, the revised PSR doubled Freeman's calculated drug weight, resulting in a base offense level of thirty-four. J.A. 209. The increased drug weight in the revised PSR assumed that Freeman filled and sold two prescriptions, consisting of 120 10mg tablets of hydrocodone per prescription, every day during the relevant two-year period, whereas the initial PSR had assumed that Freeman filled and sold only one such prescription per day. Yet the drug weight calculations in the initial and revised PSRs were both based on the same statement made by Freeman to state investigators, in which she admitted that "on a good week she gets approximately 21 (twenty-one) forged prescriptions filled, and about

---

[4] At stake were seven offense levels, which would have reduced her offense level from thirty-six to twenty-nine and the applicable Guidelines range from 210–240 to 97–121 months.

[5] In the statement made as part of her proffer, Freeman estimated that she had sold 52,000 total pills over the relevant two-year period—less than half the number of pills she was held responsible for in the revised PSR.

11

7 (seven) forged prescriptions on a bad week." J.A. 235. The revised PSR, however, determined that "[u]sing one prescription a day would [not be] an accurate account of the fraudulent prescriptions filled by Freeman" based on her statement to state investigators and the fact that Freeman "had several days where she filled numerous fraudulent prescriptions, with a high of thirteen (13) prescriptions in one day." J.A. 209.

The government argues that "it did not fully realize how many exceptional days Freeman had when filling prescriptions until after the first sentencing hearing."[6] Appellee's Br. 18 n.4. But, among the limited number of prescriptions the government provided to defendant in discovery, these "exceptional days" were outliers. *See* J.A. 207–08, 252–59. While Freeman filled thirteen prescriptions on December 30, 2014, the next largest amount she filled in a single day was five prescriptions on December 1, 2014. J.A. 227, 253. In most cases, the government identified no more than one prescription filled on any given day. J.A. 254–62. Moreover, the government provided evidence of fewer than sixty prescriptions filled by Freeman and did not provide evidence of any prescriptions filled on 650 of the 730 days in the relevant two-year period. *See* J.A. 254–62.

Thus, Freeman's probation officer must have relied primarily on Freeman's own statements to support the presumption that she successfully filled two prescriptions a day. The increase in Freeman's drug weight between the two PSRs based on substantially the same underlying information, and in contravention of the district court's instructions to review Freeman's proffer, strongly suggests that it was not proper. Further, the PSR did

---

[6] Since the initial PSR is not in the record, it is not clear whether this information was also included in that version of the report.

12

not account for Freeman's personal opioid use, which, during the relevant period, she reported was sixty to eighty pills a day. *See* J.A. 240. Freeman, therefore, had a strong argument that her drug weight calculation should have been reduced, thereby reducing her offense level by two points.

Freeman's counsel also waived a meritorious objection to the PSR's application of a two-level enhancement for obstruction of justice based on Freeman's move to North Carolina while released on bond. Under Section 3C1.1 of the Sentencing Guidelines, a sentencing court is directed to impose a two-level upward adjustment if the defendant "willfully, obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The application notes state that such an enhancement may be appropriate where the conduct involves "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." *Id.* at Application Note 4(E). A defendant acts "willfully" if he "consciously acted with the purpose of obstructing justice." *United States v. Thorson*, 633 F.3d 312, 320 (4th Cir. 2011).

To support applying this two-level upward adjustment to Freeman, the revised PSR states that she "traveled out of state without permission" and "willfully avoided authorities and violated the conditions of her bond." J.A. 210. But at her sentencing hearing, Freeman explained that she and her children had been evicted from their home in South Carolina and had moved just forty miles away to her hometown in North Carolina out of necessity. J.A. 131–32. She further testified that she had attempted to call her probation officer at the time to explain the situation. J.A. 131. And the docket does not reflect that she missed

13

any court dates while out of the state. *See* J.A. 4–5. Thus, Freeman had a nonfrivolous argument that this enhancement was improper because her move to South Carolina was not deliberately obstructive.

By waiving Freeman's objection to the upward departure for obstruction of justice, counsel also effectively lost the opportunity for Freeman to receive a downward adjustment for acceptance of responsibility. Section 3E1.1 of the Sentencing Guidelines provides for a decrease in the final offense level "if the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1. And the application notes to Section 3E1.1 clarify that "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction . . . will constitute significant evidence of acceptance of responsibility . . . ." U.S.S.G. § 3E1.1 Application Note 3. But the application notes also state that "[c]onduct resulting in an enhancement [for obstruction of justice] indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1 Application Note 4. In Freeman's revised PSR, her probation officer explained that Freeman had admitted her involvement in the offense and entered a timely guilty plea but found that she nevertheless did not "qualify" for an acceptance of responsibility credit because she had "violated the conditions of her bond" and "willfully evaded authorities." J.A. 210. Thus, had Freeman

succeeded in her objection to the two-level obstruction of justice enhancement, she may have been entitled to a further three-level credit for acceptance of responsibility.[7]

Because counsel waived these objections, the district court adopted the factual findings of the revised PSR in full,[8] and Freeman was sentenced under a Guidelines range of 210 to 240 months. If any one of these meritorious objections had been successful, however, Freeman's offense level would have been decreased by at least two levels, and she would have been sentenced under a lower Guidelines range. And, if all of them had been successful, Freeman would have been sentenced under the significantly lower Guidelines range of 97 to 121 months. Thus, by any standard of measurement, Freeman's objections, if successful, "reduce[d] the number that [was] relevant" to the district court at sentencing.[9] In stating otherwise, counsel demonstrated his "ignorance of a point of law

---

[7] Further, the application notes to Section 3E1.1 expressly state that it may be possible to receive both an upward departure for obstruction of justice and a downward departure for acceptance of responsibility in "extraordinary cases." And we have previously affirmed a Guidelines calculation that did so. *United States v. Hicks*, 948 F.2d 877 (4th Cir. 1991). "The question of whether a defendant who obstructed justice is entitled to an acceptance-of-responsibility reduction [is] a largely factual matter to be determined by the district court." *United States v. Knight*, 606 F.3d 171, 176 (4th Cir. 2010). Given Freeman's admission of criminal conduct and timely guilty plea, as well as her compelling explanation for the violation of her bond, even if the court had rejected an objection to the obstruction of justice enhancement, it could still have determined that the circumstances of Freeman's case make it one of the "extraordinary" cases in which a defendant may still receive a downward adjustment for accepting responsibility.

[8] Indeed, it is troubling that counsel's statement may have incorrectly assured the court that the waived objections would not have impacted Freeman's Sentencing Guidelines range.

[9] Even the government conceded at oral argument that if "we can conclusively say that" counsel's statement at the hearing means that he "believe[d] if he w[on] an objection, (Continued)

that [wa]s fundamental to [Freeman's] case," *see Hinton*, 571 U.S. at 275, and provided her with the kind of quintessentially ineffective assistance that lies beneath the constitutional floor, *see Carthorne*, 878 F.3d at 466.[10]

Nonetheless, the government argues that counsel's decision to waive Freeman's objections to the PSR was a tactical decision that is entitled to our deference. Specifically, the government argues that counsel reasonably determined that Freeman's objections had little chance of succeeding and, therefore, made the strategic decision to instead focus the court's attention on mitigating factors, such as Freeman's addiction and her children, and on his efforts to secure her admittance to the BRIDGE Program. Indeed, Freeman's counsel forcefully argued at the sentencing hearing that Freeman should be admitted to the

_____

it[ was] not going to affect the Guidelines calculation, we've established ineffectiveness." Oral Argument at 59:46-1:00:08, *United States v. Freeman*, No. 19-4104 (4th Cir. Oct. 26, 2021), https://www.ca4.uscourts.gov/OAarchive/mp3/19-4104-20201030.mp3 (last visited, December 29, 2021). We struggle to find another way to understand counsel's statement.

[10] Counsel's failure to understand the value of Freeman's objections to her sentencing exposure alone shows that he was woefully unprepared. But counsel further "illustrate[d] his basic failure to comprehend the relevant legal analysis," *see id.* at 469, in an improper post-sentencing filing in which he indicated that he incorrectly believed the court would still consider Freeman's written objections to the PSR despite counsel's decision to orally waive them at the sentencing hearing or that he could revive them in a "rehearing" following the sentencing. In the filing, counsel stated that "[d]efendant, by and through counsel, respectfully disagreed with the calculations of the drugs" and that Freeman "specifically provided the Court with objective evidence of her objections." J.A. 167–68. Counsel also spent nine of the sixteen pages in the filing rehashing the evidence in favor of Freeman's objection to the calculated drug weight. But it is axiomatic that a knowing and voluntary waiver is almost always binding. *See United States v. Robinson*, 744 F.3d 293, 298–99. And, as the district court noted, Federal Rule of Civil Procedure 59(e), which provides for a rehearing in the civil context, "does not apply to criminal proceedings." *See* J.A. 200. Thus, counsel not only unreasonably failed to recognize the effect that Freeman's objections to the PSR could have had on her sentence, but also seems to have been ignorant of the conclusive effect of his oral waiver.

program because she was severely addicted to opioids and her crippling addiction was the source of all her criminal conduct. J.A. 114–21. And he later stated in his improper post-sentencing filing that the decision to waive Freeman's objection was made "to bypass a confrontational hearing with the government," J.A. 168, and "based on what appeared to be the quintessential case for the BRIDGE program," J.A. 178. Further, Freeman stated in a *pro se* filing to this court that counsel had advised her to waive the objection to avoid creating a "hostile environment" at her sentencing hearing.

But a decision made by counsel cannot have been tactical "if it made no sense or was unreasonable." *Vinson*, 436 F.3d at 419. While "[c]ounsel may have a strategic reason for not raising a particular objection" at sentencing, *Carthorne*, 878 F.3d at 466, if this strategic choice was "made after [a] less than complete investigation[,]" such a strategy is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," *Strickland*, 466 U.S. at 690–91. At Freeman's sentencing hearing, counsel was candid that he was waiving her objections because he did not believe they could "reduce the number that is relevant to this [c]ourt." J.A. 108. But a cursory "investigation" would have revealed that this conclusion was wrong, and any reasonably competent attorney would not have made the same mistake.

Thus, even if Freeman were a strong candidate for the BRIDGE program,[11] counsel's decision to focus on her motion to enter the program at the expense of her

---

[11] Contrary to counsel's apparent belief, Freeman was not a strong candidate for the BRIDGE program. First, the BRIDGE Program's Mission Statement and Policies state that the presence of "unrelated pending criminal cases," including state cases, "may (Continued)

objections to the PSR cannot have been strategic because *he did not understand the potential value of the objections*. Any purported strategic calculus that weighed the value of those objections was, therefore, inherently unreasonable because it was "made after [a] less than complete investigation" and no "reasonable professional judgments supported" counsel's failure to understand the potential impact of Freeman's objections on her sentencing exposure. *Cf. Wiggins v. Smith*, 539 U.S. 510, 526 (2003) ("[A]s we have made clear, counsel were not in a position to make a reasonable strategic choice as to whether to focus on [defendant's] direct responsibility, the sordid details of his life history, or both, because the investigation supporting their choice was unreasonable.").

The government also argues that we should wait to review this claim on collateral review to benefit from a fully developed record. While it is true that we typically review

---

disqualify a candidate from participation in the program." *See* U.S. Dist. Ct. for Dist. S.C., BRIDGE Program: Mission Statement & Policies, https://www.scp.uscourts.gov/sites/scp/files/BRIDGE%20Program%20Mission%20Policies_Greenville.pdf (last visited December 29, 2021). At the time of her sentencing, Freeman had several pending state charges. J.A. 214–15. Second, eligibility for the program is also based on consideration of several factors including: i) the drug quantity involved, ii) whether the defendant engaged in obstruction of justice, and iii) the degree of sentencing exposure. *Id.* Based on these three factors, Freeman was unlikely to be considered eligible, especially once counsel waived her objections to the drug weight calculation and obstruction of justice enhancement. Further, counsel appears to have made no more than a cursory attempt to determine whether Freeman was eligible for the program. In a September 2018 email he sent to a probation officer involved with the program, he stated, "I am not completely sure of the parameters of drug court" and asked for the agent's "thoughts" on Freeman's case. J.A. 184. In December 2018, less than two weeks before Freeman's sentencing hearing and the day before submitting her motion to enter the BRIDGE program, counsel followed up with a second email in which he asked the agent to "point me in the right direction as to what the Court looks for in giving applicants this opportunity." J.A. 185. Thus, it also appears that counsel "failed to perform basic research" sufficient to support a strategic choice involving the BRIDGE program.

18

ineffective assistance of counsel claims on collateral review, we have previously reviewed such claims on direct review where the ineffectiveness of counsel "conclusively appears in the trial record itself." *Fisher*, 477 F.2d at 302; *see also Massaro v. United States*, 538 U.S. 500, 508 (2003) ("We do not hold that ineffective-assistance claims must be reserved for collateral review. There may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal."). This is one such case.

Counsel's ineffectiveness is patent on the record before us now. We do not need to further develop the record to know why counsel waived Freeman's objections; he explicitly stated his reasoning at the sentencing hearing. Counsel frankly explained to the court that he was waiving Freeman's objections because he incorrectly and unreasonably believed that her objections would not affect her Guidelines range. Counsel also described Freeman's objections as "minimal," even though they could have reduced the low end of her Guidelines range by almost ten years, and incorrectly stated "we don't think [the objections] take[] away from the vast number of pills that the Government has accused her of dispersing or acquiring." J.A. 107. But of course, one of Freeman's waived objections was to the calculated *drug weight itself* and, therefore, would have necessarily "take[n] away from the vast number of pills" that she was being held responsible for fraudulently acquiring. *See* J.A. 259. Because counsel explained his actions to the court at the sentencing hearing, Freeman's claim is unlike the claim we declined to adjudicate on direct appeal in *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991), on the grounds that we considered it "unfair to adjudicate the issue without any statement from counsel on the

19

record." Here, "nothing would be gained by postponing consideration of [Freeman's] [S]ixth [A]mendment claim." *See Fisher*, 477 F.2d at 302.

B.

That counsel's deficient performance prejudiced Freeman is also apparent on the record here. To show prejudice, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* And "in most cases, when a district court adopts an incorrect Guidelines range, there is a reasonable probability that the defendant's sentence would be different absent the error." *Molina-Martinez v. United States*, 578 U.S. 189, 192 (2016).

Freeman had several meritorious objections to her PSR and, but for counsel's unreasonable waiver of these objections, there was a reasonable probability that her sentence would have been reduced. In total, had the court reduced Freeman's drug weight calculation, denied the obstruction of justice enhancement, and granted her an adjustment for acceptance of responsibility, Freeman would have been sentenced under a significantly lower Guidelines range of 97–121 months instead of 210–240 months. Further, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.*; *see also id.* at 201 (noting that "the Guidelines are most likely to have influenced the district court's sentencing decision" "where the court chose a sentence within what it believed to be the applicable Guidelines range"). Thus, even if the reduced

20

Guidelines range applicable to Freeman's offense level still encompassed her 210-month sentence,[12] that is sufficient in this case to "undermine confidence in the outcome."

Finally, it is true that the court below stated it would have imposed an identical sentence as a variance, regardless of the calculated Guidelines range. J.A. 142 ("I would have imposed this same sentence as an alternate variant sentence in light of all of the 18 [U.S.C. §] 3553(a) factors."). But, while we have found that this type of statement by a sentencing judge may insulate a sentence from harmless error review, *United States v. Gomez-Jimenez*, 750 F.3d 370, 382 (4th Cir. 2014), we decline to allow it to do so in the *Strickland* prejudice context.[13] Here, it is clear from the record that, but for counsel's unprofessional waiver of Freeman's objections at sentencing, there is a reasonable probability that her sentence would have been different.

* * *

Because Freeman clearly received ineffective assistance of counsel, we do not reach the substantive reasonableness of her sentence. Accordingly, we vacate Freeman's sentence and remand for resentencing consistent with this opinion.

*VACATED AND REMANDED*

---

[12] For example, if the court were to accept Freeman's objection to the revised drug weight calculation but reject her other objections, her total offense level would be reduced by two points and the applicable Guidelines range would be 168–210 months.

[13] Notably, the harmless error standard applies to errors that were brought to the attention of the district court at sentencing. Thus, when a court employs this type of statement to protect its sentence from harmless error review, it does so in the context of a specific error or errors. Here, counsel assured the court that the waived objections would not have changed the Guidelines range before the court.

21

QUATTLEBAUM, Circuit Judge, with whom Judges WILKINSON, NIEMEYER, AGEE and RUSHING join, dissenting:

"Measure twice, cut once." Wise carpenters follow this good advice. In contrast, by taking the extraordinary step of finding ineffective assistance of counsel on direct appeal, we hurry to cut without even gathering all the available tools to measure accurately. More specifically, we declare counsel's representation of Precias Freeman ineffective without hearing his explanation for the decisions he made. For good reason, this almost never happens. Basic fairness, not to mention common sense, dictates that before reaching such a conclusion, we notify the counsel whose effectiveness has been called into question and we hear what he has to say. After all, as we have seen over and over in litigation, there are two sides to most stories.

But to the majority, notice and an opportunity to be heard are not needed here. Those principles of a fair process can be cast aside. To be sure, the majority recites the right words. It proclaims that the bar for such a finding on direct appeal is high and that this is one of those rarest of situations where it is appropriate. But at the same time, it reaches that conclusion without mentioning, much less considering, how some of the most damning evidence against Freeman might have played into counsel's performance. And as to the evidence on which it relies concerning counsel, much of it is cherry-picked from its context and assigned the most culpable meaning when there are alternative interpretations that might very well be reasonable. Then, in assessing prejudice, the majority disregards the district court judge's statement that even if he decided the Guidelines issue incorrectly, he would have imposed the same sentence as an alternate variant sentence.

22

Why the rush to judgment? At the end of the day, the majority may turn out to be right. In fact, I favor inquiry into its concerns. Here, however, the record on direct appeal does not provide clear reasons for Freeman's counsel's decisions. Thus, we should not disregard our normal and prudent practice of evaluating a claim like this on collateral review where we would have the benefit of a fully developed record. Because the majority rejects this approach, and because doing so creates a real risk of an incorrect and unjustified decision, I respectfully dissent.

## I.

This sad case illustrates the opioid epidemic ravaging our country. Precias Freeman is a victim of this epidemic. As a teenager, she succumbed to the highly addictive nature of opioids in a way that continues to wreak havoc on her life. As a fellow citizen, I am heartbroken over the toll her addiction has levied. But Freeman chose to be a culprit too. By her own admission, she forged prescriptions to obtain opioids for years—not just for herself, but to sell to others.

By all accounts, Freeman was a prolific trafficker of fraudulent opioid prescriptions. Her sentence here arises from her October 2, 2016 arrest while in the midst of obtaining a false prescription. After waiving her *Miranda* rights, Freeman spoke with officials from the South Carolina Department of Health and Environmental Control. She admitted to selling opioids obtained from fraudulent prescriptions.

Freeman also explained the extent of her criminal activity. She said that on a good week, she passed 21 false prescriptions and, on a bad week, a minimum of seven. And,

23

while the majority contends Freeman was not "enriched by her drug sales," Maj. Op. 3, she admitted clearing $1,000.00 per week in profit from selling opioids.

After being indicted for conspiracy to unlawfully possess with the intent to distribute oxycodone and hydrocodone, Freeman was released on bond. She generally complied with her release conditions until shortly after pleading guilty in June 2017. At her plea hearing, the district court removed the location monitoring condition of her bond.

As part of a standard proffer agreement, investigators interviewed Freeman again in July 2017 about her previous conduct leading up to her charges. This time she admitted she passed one prescription per day four to five days a week but passed four to five prescriptions on some days. Freeman added that she sold approximately 500 pills a week to her primary customer and that she consumed 60 to 80 pills a day herself.

The following month, Freeman violated her release conditions. First, she tested positive for drugs. Second, after being evicted from her apartment, she left South Carolina and checked into a hotel in Shelby, North Carolina. At that point, she got in touch with her probation officer. When they talked, she initially agreed to return, but then, after learning that Department of Social Services would be involved, she refused. She remained at large and continued passing false prescriptions. Over six months later, in March 2018, authorities in Shelby arrested Freeman for prescription fraud, the same crime she committed repeatedly in South Carolina, leading to her return to South Carolina for sentencing.

Probation officials prepared a presentencing report ("PSR"). Based on Freeman's October 2016 statements to the South Carolina Department of Health and Environmental Control, the PSR initially estimated drug weight consistent with one false prescription per

day, every day, for two years. That drug weight equated to a base offense level of 32. Freeman initially agreed to this PSR, but at sentencing, she objected to the calculated drug weight. Freeman also expressed dissatisfaction with her counsel, an assistant federal public defender. As a result, the district court granted her a continuance to obtain new counsel. In view of her objecting to the drug weight in the initial PSR and the breach of her proffer agreement by absconding, the court also notified Freeman that the government would be able to revisit the drug calculations in the PSR.

Probation's revised PSR re-calculated the drug weight based on Freeman having filled two fraudulent prescriptions per day, rather than one. Probation based these calculations on evidence provided in discovery that Freeman actually filled many more than one false prescription a day. She admitted trying to fill three prescriptions a day. And records showed Freeman filled numerous prescriptions per day on a number of occasions, with a high of thirteen prescriptions in one day. The government, therefore, contends that basing drug weight on two false prescriptions per day is conservative.

The PSR also recommended a two-level increase for obstruction of justice related to Freeman's willful avoidance of authorities and violation of the conditions of her bond. And the PSR did not recommend an adjustment for acceptance of responsibility based on Freeman's flight and continued criminal conduct.

Freeman obtained new counsel, the counsel whose effectiveness we consider today,[1] shortly before Probation filed its amended PSR. After the government filed its sentencing

_____

[1] Neither the majority nor I are discussing the performance of court-appointed counsel on appeal whose fine work in presenting these arguments to us is not at issue.

memorandum, Freeman's counsel submitted "Defendant's Objections to Revised Presentence Investigation Report." Freeman's counsel objected to the PSR's drug weight calculations and obstruction enhancement. On behalf of Freeman, counsel filed a motion to enter the BRIDGE Program, the District of South Carolina's drug court, citing Freeman's addiction to opioids that drove her history of criminal activity. At the sentencing hearing that followed, Freeman withdrew, on advice of counsel, the objections to the PSR. The withdrawal of these objections form the primary basis of Freeman's ineffective assistance of counsel claim.

## II.

## A.

Whether counsel provided ineffective assistance is a mixed question of law and fact which we review de novo. *Smith v. Moore*, 137 F.3d 808, 817 (4th Cir. 1998). To prove counsel was constitutionally ineffective, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 692 (1984). As to the first prong, counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (per curiam). At the same time, however, the Supreme Court has directed lower courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" when evaluating counsel's performance under the first

26

prong. *Strickland*, 466 U.S. at 689. Thus, "judicial scrutiny of counsel's performance must be highly deferential." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citation and alteration omitted). And our approach must be from the standpoint of whether counsel's perspective at the time would indicate the challenged action "might be considered sound . . . strategy." *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

At the same time, typically a defendant raises the ineffective assistance of counsel claim collaterally by a motion under 28 U.S.C. § 2255 in district court. *United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997) (discussing the obligation to do so as "well settled"). Doing so allows for adequate development of the record. *See id.* An ineffective assistance of counsel claim is only cognizable on direct appeal if the record conclusively demonstrates that the lawyer failed to provide effective representation. *United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008). It must "conclusively appear[] in the trial record itself that the defendant was not provided . . . effective representation." *United States v. Mandello*, 426 F.2d 1021, 1023 (4th Cir. 1970); *see also Benton*, 523 F.3d at 435.

Because that bar is so high, "we routinely decline to address on direct appeal a criminal defendant's contention that counsel has performed in an ineffective manner." *United States v. Brown*, 757 F.3d 183, 191 (4th Cir. 2014). In fact, in our Court's history, by my count we have only vacated a sentence on direct appeal based on ineffective assistance of counsel twice in published decisions. *See United States v. Russell*, 221 F.3d 615 (4th Cir. 2000) (finding clear and uncontradicted record showing that (1) client told counsel two prior convictions the government intended to use for impeachment had been

27

overturned; (2) the convictions had in fact been overturned; (3) counsel believed the government that the convictions were valid; (4) counsel failed to even check to see if the convictions were valid; and (5) the convictions were used, without objection from counsel, at trial); *United States v. Fisher*, 477 F.2d 300, 301–302 (4th Cir. 1973) (discussing how counsel conceded he had not prepared for trial at all before the day of trial and only met with defendant for thirty minutes the day of trial).

Our case today bears no resemblance to those situations. While the record in those cases conclusively establishes ineffectiveness, the record here is far from clear. And in situations like this, the Supreme Court has instructed: "The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse." *Massaro v. United States*, 538 U.S. 500, 505 (2003).

B.

As noted above, prior to the sentencing hearing, Freeman's counsel lodged objections to Freeman's PSR related to the drug weight Freeman trafficked and her obstruction of justice enhancement. At the hearing, however, Freeman's counsel withdrew all objections. In so doing, counsel indicated to the court that "none of those objections reduce the number that is relevant to this Court." J.A. 108. Instead of pursuing these objections, Freeman's counsel decided to focus solely on the motion to enter the BRIDGE Program. He made a compelling argument in his motion and presentation at the sentencing hearing that Freeman suffered from a debilitating addiction and all her criminal conduct was tied to that addiction. In this presentation, counsel focused on Freeman's positive and

28

sympathetic traits—including the fact that she has several young children, a supportive family and a strong desire to conquer her addiction.[2]

The majority seizes on counsel's statement that "none of those objections reduce the number that is relevant to this Court." J.A. 108. It claims this statement shows counsel was "unequivocally wrong on the law." Maj. Op. 10. In isolation, as the majority rightly notes, counsel's statement was not correct. At stake were potentially seven offense levels—two related to drug weight, two for obstruction of justice and three for failure to accept responsibility. Success on any of those three objections would have reduced the Guidelines range. Success on the drug weight objections would have reduced the Guidelines range to 168 to 210 months and success on all three would have resulted in a Guidelines range of 97 to 121 months.

---

[2] The majority also criticizes counsel's efforts regarding the BRIDGE Program. It writes: "Emails in the record suggest that counsel did not understand how to obtain entry into the program or what the district court would need in order to grant a motion to enter it; he wrote in an email to the program's supervising probation officer that he was 'not completely sure of the parameters of the drug court.' Months later, and shortly before Freeman's sentencing hearing, he sent a second email in which he asked the officer to 'point me in the right direction as to what the [c]ourt looks for in giving applicants the opportunity.'" Maj. Op. 7–8 (alteration in original) (J.A. citations omitted). The majority later criticizes counsel by asserting that Freeman was not a good candidate for the BRIDGE Program. *Id.* at 17. But the very eligibility requirements the majority references also note that no combination or quantity of favorable and disfavorable factors is deemed determinative. Likely for that reason, counsel communicated with Probation to evaluate the opportunity on behalf of Freeman and to present and highlight the factors and circumstances that would make the best case for admission. This shows diligence, not ineffectiveness. No lawyer is an expert in every part of the practice and confirming with the experts that one's understanding is correct does not deserve the chastising the majority gives it.

But in determining if the record conclusively establishes effectiveness, we should examine the statement in its context. Doing so reveals the following colloquy between the court and counsel just before the remark upon which Freeman and the majority latch:

> Q. So, you are agreeing to withdraw objection number 1?
> A. Yes.
> THE COURT: Okay. All right. Objection number 2, Mr. Smith.
> MR. SMITH: Your Honor, may it please the Court. As we discussed the objections, Ms. Freeman and I have discussed the relevance of the objections and with regard to the big picture, and the objections are not going to change, in essence, what the charges are, and we believe that the drug court or some of the arguments made in the drug court are what is more pertinent than objections over what might be considered as minimal even if found to be appropriate or the arguments being valid, we don't think that that takes away from the vast number of pills that the Government has accused her of dispersing or acquiring.

J.A. 107.

Later, at the sentencing hearing, counsel reiterated the same sentiment. "As I said when we were discussing objections, the big picture is nothing is going to change out of those objections the fact that she is an addict and the Opioids have consumed her life." J.A. 117.

When considered in conjunction with these statements, counsel's remark may in fact reflect a strategic decision. It appears at least plausible that counsel felt and was trying to communicate that, even if Freeman prevailed on her objections, the government would likely have been able to prove that Freeman fraudulently acquired and disbursed a "vast number of pills." J.A. 107.[3]

---

[3] In addition, the objections counsel filed to the revised PSR argue that the drug weight advanced by Freeman reduced her base offense level. This statement provides (Continued)

30

In fact, while the majority describes perhaps the best case for the drug weight objection, it was far from a sure thing. There was compelling evidence that supported the drug weight calculated in the second PSR. In Freeman's first statement, she admitted to passing one to three false prescriptions per day. Since two per day is in the middle of that range, it hardly seems unreasonable. In her second statement, Freeman said she filled one false prescription most days but on others filled four to five. The records from pharmacies confirm her statements and even reflect a staggering total of thirteen false prescriptions on one day. Against that evidence, counsel might have reasonably felt two prescriptions per day would likely be upheld.

And even if Freeman pressed her objections, she had consented to the first PSR which contained a drug weight based on the assumption of one false prescription per week. Counsel could have felt that the weight from that assumption, which resulted in a criminal offense of 32, was his best possible outcome. And the Guideline range under that outcome was 168 to 210 months, a range that, ironically, encompassed the sentence the district court ultimately assessed.

Thus, regarding the drug weight objection, it is fair to question counsel about his comment that "none of those objections reduce the number that is relevant to this Court." J.A. 108. But when considered in context, neither that statement nor the overall record

---

additional indication that counsel was not ignorant about the effect of the objections to Freeman's Guidelines range, but instead made a strategic choice that the potential benefits of pursuing the objections were outweighed by the resulting risks.

conclusively shows that, as the majority accuses, counsel did not understand the value of the objection.

The majority also criticizes counsel for withdrawing Freeman's objection to the obstruction enhancement. It points out that Freeman said she left the state post-conviction after being evicted. To the majority, this means she left "out of necessity." Maj. Op. 13. But the majority, unfairly in my view, gives scant attention to the likelihood that this objection would have opened the door to testimony from the government about Freeman refusing to return after promising Probation she would do so, remaining at large for months and continuing to engage in the fraudulent passing of prescriptions that she was indicted for in South Carolina. This conduct would likely not have been viewed to be "out of necessity." So, while this objection may also have been meritorious, counsel may have justifiably felt it was a long shot that carried serious risks.

Facing what he apparently assessed to be objections with dim chances of success, counsel seems to have felt that pursuing the BRIDGE Program was the best strategy for Freeman. And while counsel's decision to put all its eggs in the drug court basket may, in hindsight, have turned out to be a poor strategy, it nonetheless seems quite plausible that it was a tactical decision to withdraw the objections. The withdrawal could more broadly be viewed as a strategic choice to avoid focusing on Freeman's criminal activity at the sentencing hearing, including her prolific fraudulent prescription filling and months-long absence from the jurisdiction incommunicado, and to instead focus on her mitigating traits.

The record indicates that counsel and Freeman knew that the government was prepared to call several witnesses if Freeman chose to litigate the objections, and it may

have been reasonable for Freeman's counsel to consider that this testimony might irreparably alter the sympathetic narrative he wished to convey to the district court. In fact, just before Freeman herself confirmed her agreement to the withdrawal of the objections, the government explained that "I have got Ms. Rogers here from Probation as you mentioned; I have a DHEC inspector, Mr. Thomason, who interviewed her along with Rachel Richmond back in October 2016; and I have Adam Roberson with DEA Diversion, the Federal case agent, who interviewed Ms. Freeman as well prior to her absconding. And to the extent we need testimony, all of these individuals are ready to go." J.A. 109–10. According to the government's counsel, Inspector Roberson, who had twenty years of experience, was prepared to describe Freeman as "the most prolific prescription passer that he has investigated in his career." J.A. 125. Such testimony no doubt would have been impactful. Thus, under the deferential standard by which we must consider counsel's conduct, I cannot say his strategy was conclusively ineffective.

In fact, while the majority criticizes counsel at almost every turn, we should not ignore the results of the hearing. While the district court denied Freeman's motion for admission into the BRIDGE Program, it imposed the lowest possible sentence within the applicable Guidelines range. Perhaps the result would have been the same if Freeman pressed her objections and the government elicited the responsive testimony. Or perhaps not. She might have received a higher sentence.

But, of course, we do not know for sure why counsel advised Freeman to waive the objections. It is impossible to discern from the record alone. That is why we need a developed record that includes testimony from Freeman's counsel. "[I]t would be unfair to

adjudicate the issue without any statement from counsel on the record." *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991). Without more evidence as to why Freeman's counsel chose to take certain actions, "it is impossible to make a reasoned judgment as to whether or not representation was ineffectual." *Id.* at 120–21 (internal citation and quotation marks omitted).

The majority rejects this approach. It purports to know counsel's thinking. To the majority, the record is clear that counsel did not understand that the objections, if successful, would have led to a lower sentence. I have great respect for my colleagues. But I do not think any of us are so clairvoyant as to know for sure the strategic thinking of counsel in the throes of litigation. And I just do not understand why we are unwilling to hear from the lawyer whom we condemn. Instead, this decision is "best left to collateral review" so Freeman can develop an adequate record, which could shed light on why Freeman's counsel advised her to withdraw the objections, and how the court may have ruled on the objections if the government's witnesses were to testify. *United States v. Hoyle*, 33 F.3d 415, 418 (4th Cir. 1994). Having Freeman pursue this claim on a § 2255 motion would allow her to produce this evidence, and it would prevent us from speculating about counsel's motives and capabilities.

C.

Even if we were to assume counsel's performance fell below the constitutional standard, it is far from clear that Freeman was prejudiced. When evaluating the second prong of *Strickland*, the question is "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

34

*Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (internal citation and quotation marks omitted). That means Freeman must establish that there is a reasonable probability she would have prevailed on some or all of her objections and that, if she had, it would have resulted in a lower sentence.

I have already discussed Freeman's likelihood of success in evaluating the apparent strategic decision counsel made in advising Freeman to withdraw the objections. Suffice it to say, she faced an uphill battle on those objections. But even if she had prevailed, we have previously held that error may be harmless if it is clear that "the district court would have reached the same result even if it had" decided a Guidelines issue differently. *United States v. Gomez*, 690 F.3d 194, 203 (4th Cir. 2012); *see also United States v. Gomez-Jimenez*, 750 F.3d 370, 382 (4th Cir. 2014). Here, the district court stated that it would have still maintained the same sentence as an alternate variant sentence even if the Guidelines range differed. The majority seemingly criticizes the district court as an effort to "insulate a sentence from harmless error review." Maj. Op. 21. Instead, I take the district court at its word which means there is not a reasonable probability that, but for the errors the majority attributes to counsel, the result of Freeman's sentencing proceedings would have been different.

What's more, imposing the same sentence would not necessarily have been a variance. Had Freeman's counsel only succeeded in lowering the drug weight, Freeman's offense-level would have dropped by two points. That would have resulted in a Guidelines range of 168 to 210 months. Thus, Freeman's sentence of 210 months would have still been

35

within the Guidelines, albeit the high point. This further cuts against a clear finding of prejudice.

III.

I have great sympathy for Freeman's circumstances. Her story reflects failures in our community. And while the record may identify some concerns regarding the effectiveness of the counsel Freeman received, it does not conclusively demonstrate a failure to meet the constitutional bar at this juncture. Before deciding that Freeman's counsel was ineffective, we should hear his side of the story. There are many reasons not doing so is a bad idea. Deciding issues without all available information risks making a mistake. It also runs counter to our time-honored custom and precedent of deciding ineffective assistance of counsel by collateral attack rather than direct appeal. Finally, it is unfair to Freeman's counsel and our justice system as a whole. In my view, we should slow down as the wise carpenters would. We need to take a deep breath and follow our normal measured process. Because the majority insists on pressing forward with a decision that to me is too hasty, I dissent.